Lisa J. Frisella (SBN 216504)
Kimberly D. Neilson (SBN 216571)
FRISELLA LAW, APC
2139 First Ave., Suite 200
San Diego, California 92101
Telephone: (619) 260-3500
Facsimile: (619) 260-3600
Email: lisa@frisellalaw.com
        kim@frisellalaw.com

Bruce Steckler (SBN 00785039)
Dean Gresham (SBN 24027215)
Stuart Cochran (SBN 24027936)
L. Kirstine Rogers (SBN 24033009)
**STECKLER GRESHAM COCHRAN PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: bruce@stecklerlaw.com
        dean@stecklerlaw.com
        stuart@stecklerlaw.com
        krogers@stecklerlaw.com

John T. Palter (SBN 15441500)
**PALTER STOKLEY SIMS, PLLC**
8115 Preston Road, Suite 600
Dallas, TX 75225
Telephone: (214) 888-3111
Facsimile: (214) 888-3109
Email: jpalter@palterlaw.com

Attorneys for Plaintiff Blaise Williams
And the Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

1

CLASS ACTION: FIRST AMENDED COMPLAINT

BLAISE WILLIAMS, individually, and on behalf of all others similarly situated,

      Plaintiffs,

v.

PROGRESSIVE COUNTY MUTUAL INSURANCE COMPANY, PROGRESSIVE CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY, and MITCHELL INTERNATIONAL, INC.;

      Defendants.

CASE NO. 17-cv-2282-AJB-BGS

**CLASS ACTION**

FIRST AMENDED COMPLAINT FOR:

1. Breach of Contract;
2. Tortious Interference with Contract;
3. Violations of Texas Insurance Code;
4. Violations of Texas Insurance Code;
5. Breach of Implied Covenant of Good Faith and Fair Dealing;
6. Conspiracy; and
7. Declaratory and Injunctive Relief

DEMAND FOR JURY TRIAL

     Plaintiff BLAISE WILLIAMS, individually and on behalf of all other similarly situated individuals, hereby complains against Defendants PROGRESSIVE COUNTY MUTUAL INSURANCE COMPANY, PROGRESSIVE CORPORATION, and PROGRESSIVE CASUALTY INSURANCE COMPANY, (collectively "Progressive"), and MITCHELL INTERNATIONAL, INC. ("Mitchell"); Progressive and Mitchell are collectively referred to herein as "Defendants," and allege as follows:

**PRELIMINARY STATEMENT**

    1.    Progressive bills itself as a fair and honest company. Progressive spends millions of dollars advertising its insurance. In those advertisements, Progressive holds itself out as an expert in the insurance industry, including automobile insurance, and touts itself as the "No. 1 commercial auto insurer."

    2.    Progressive, however, is not fair and honest.

    3.    When Progressive determines that damage to an insured's vehicle exceeds the cost to repair, the vehicle is deemed a "total loss," and the insured is entitled to recover for the actual cash value of the vehicle at the time of the loss reduced by the

applicable deductible.

4.     Progressive has outsourced its duty to Mitchell to determine the actual cash value of its insureds' total loss vehicles. Since at least 2010, Progressive and Mitchell have implemented a scheme to artificially deflate the value of "total loss claims."

5.     Progressive and Mitchell engage in unlawful, unfair, and deceptive business practices which facilitate and enable them to present lowball valuations to Progressive's insureds once a vehicle has been declared a total loss.

6.     In their scheme to unlawfully, unjustifiably, and artificially reduce the actual cash values paid to the insureds for their total loss vehicles, Progressive and Mitchell employ methods contrary to their contractual obligations, the Texas Insurance Code, and the common law.

**PARTIES**

7.     Plaintiff Blaise Williams is an individual over 18 years of age. He is, and at all relevant times was, a resident of Houston, Texas.

8.     Defendants Progressive County Mutual Insurance Company ("Progressive County Mutual") and Progressive Casualty Insurance Company ("Progressive Casualty") are wholly owned and controlled affiliates/subsidiaries/alter-egos of The Progressive Corporation (or "TPC") (collectively the "Progressive Defendants" or "Progressive"). Progressive County Mutual is a shell corporation with no office, phone number, website, personnel, or operations of its own, but which is utilized by Progressive only on paper for some of its Texas operations because of the favorable regulatory treatment Progressive receives in Texas from operating under the guise of a county mutual company. The Progressive Defendants, together with numerous other TPC affiliates/subsidiaries/alter-egos involved in the insurance business nationwide, collectively operate as a single insurance business or enterprise under the name "Progressive." The Progressive Corporation, which controls Progressive's operations, is incorporated in Ohio and its headquarters and principal place of business is located at 6300 Wilson Mills Road, Mayfield Village, Ohio.

CLASS ACTION: FIRST AMENDED COMPLAINT

9.     Defendant Mitchell International, Inc. provides third-party administrative services for Progressive including claims administration and adjusting services relating to the valuation of total loss vehicles for insureds covered by Progressive's Texas Auto Policy.  Mitchell is a Delaware Corporation.  Mitchell's headquarters and principal place of business is located at 6200 Greenwich Drive, San Diego, California.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d) because at least one Class Member is diverse from at least one defendant, the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are more than 100 Class Members.

11.     This Court has personal jurisdiction over Defendant Mitchell because it is at home in the forum state.

12.     Because TPC, Progressive County Mutual, Progressive Casualty, and TPC's numerous other insurance affiliates/subsidiaries are alter egos operating as one single insurance entity/business (collectively "Progressive"), and represent themselves as such to their insureds, their investors, the Securities and Exchange Commission ("SEC"), and to the public at large, the California contacts for Progressive are attributable to the individual Progressive Defendants. This Court has personal jurisdiction over Defendant Progressive because it has had more than minimum contacts with the State of California, has purposefully availed itself of the privilege of conducting business in this state, and has purposefully directed and targeted business in this state, specifically by, but not limited to, contracting with Mitchell, a California citizen, in California to provide claims administration and adjusting valuation services for vehicles in Texas and elsewhere for Progressive's insureds who suffer total losses, which Mitchell performed in California. The claims at issue in this lawsuit arise out of or relate to Progressive's agreement with Mitchell in California to use its valuation and adjusting services, Progressive's subsequent implementation of Mitchell's valuation and adjusting system for its insureds, including its Texas insureds such as Mr. Williams and the proposed class, and Mitchell's

4

services themselves, which took place in California. Progressive provides information concerning the total loss vehicles to Mitchell in California, which Mitchell then uses to perform its valuation and adjusting services in California, which Mitchell then sends to Progressive, and which Progressive then sends to the insureds. Progressive has a nationwide claims service operation, so it is unknown at this time where Progressive specifically performed its claims handling service at issue in this lawsuit,[1] but given Mitchell's location and operations in California and Progressive's utilization of Mitchell's California services in connection with handling all of its total loss claims since 2010, the conduct at issue in this lawsuit was knowingly focused in California and understood to take effect in California.

13.    Further, this Court has personal jurisdiction over Progressive because Progressive is at home in California. Progressive's continuous and systematic contacts with California are exceptionally massive. Progressive has at least seventeen (17) offices in California, hundreds, if not thousands, of employees in California, and does over a billion dollars' worth of business yearly in California. Progressive heavily advertises and solicits business in California and avails itself of the privileges and opportunities of conducting its insurance business in California. Progressive is domiciled in California through at least three (3) of its wholly owned/controlled affiliates/subsidiaries/alter-egos which are domiciled in or incorporated in California, including Pacific Motor Club, Makaira Indica, L.P., and ASI Select Automobile Insurance Corp. In addition, Progressive also operates in California through at least nineteen (19) subsidiaries/affiliates/alter-egos which are registered to do business in California with the California Department of Insurance. These affiliates/subsidiaries/alter-egos, like all of the other Progressive insurance entities, are 100% owned or controlled by TPC and operate as part of the single Progressive enterprise. In other words, like Progressive's operations

---

[1] Mr. Williams spoke with multiple claims adjusters who represented they were from Progressive in connection with his total loss who were not based in Texas, including the initial Progressive adjuster.

CLASS ACTION: FIRST AMENDED COMPLAINT

in Texas, Progressive utilizes shell corporations/alter-egos in California to conduct its business in this State.

14.    Progressive—on its website, advertisements, communications, regulatory filings, etc.—explicitly represents and affirms it is a single insurance-selling enterprise operating in all fifty states. For example, TPC, which is publicly traded and thus subject to SEC reporting disclosures, under the "narrative of business" section in a 2012 SEC filing, states:

> We offer a number of personal and commercial property-casualty insurance products primarily related to motor vehicles… Auto insurance differs greatly by community because legal requirements and decisions vary by state and because, among other factors, traffic, law enforcement, cultural attitudes, insurance agents, medical services, and auto repair services vary by community… We currently write personal auto insurance in all 50 of the United States, the District of Columbia, and on an Internet-only basis in Australia. Our personal auto management group is organized by state into four geographic regions in the United States, plus a region for Australia. Each region is led by a general manager. We have a separate manager for our California Agency organization… We write the majority of our special lines products in all 50 states. Our special lines management group is organized by product and led by a general manager… A Group President manages our Commercial Auto business, which offers products in 49 states… The Commercial Auto business is organized by state, with product managers responsible for local implementation. These state-level managers are led by two regional directors who report to a general manager… A Group President manages our Claims business function, which is organized into four groups. Three of the groups are based on geographic region, and one is a countrywide group that provides various claims-related services, including catastrophe response and special investigations. Each group is headed by a general manager, and each handles both Personal Lines and Commercial Auto Claims… Our customer service groups, located at call centers in Mayfield Village, Ohio; Austin, Texas; Tampa, Florida; Sacramento, California; Tempe, Arizona; and Colorado Springs, Colorado, support our policy

CLASS ACTION: FIRST AMENDED COMPLAINT

servicing, agency distribution, claims, and direct sales operations. https://www.sec.gov/Archives/edgar/data/80661/000119312513075784/d441077d10k.htm.

15. Progressive has stated it decided to organize its business utilizing different subsidiaries/affiliates (many or all of which are shell corporations) for different geographic locations because auto insurance and accompanying regulation vary greatly from state to state, such that utilizing different corporate formats as the underwriter for its policies depending on the state can be favorable from a regulatory perspective. However, despite this seemingly elaborate structure, Progressive conducts all of its operations as a single Progressive entity, with TPC in charge. In fact, many, if not all, of the specific affiliates/subsidiaries/alter-egos identified on Progressive's insureds' policies are shell companies that exist only on paper. For instance, TPC reported to the SEC that its Texas affiliate, Defendant Progressive County Mutual, is "100% controlled" by TPC and has no employees, office space, supplies, or equipment and does not engage in any activity or operations.[2] In fact, Progressive County Mutual specifically does not have authority to conduct business, which is instead reserved to Progressive, and includes the following authority:

    a. to be responsible for the management and the formulation of the business policies of Progressive County Mutual;

    b. to promote, develop and manage the business of Progressive County Mutual in an efficient and capable manner;

---

[2] While Defendant TPC disclosed Defendant Progressive County Mutual is 100% controlled by TPC and all of Progressive County Mutual's officers and directors were employees of TPC, the technical corporate structure providing TPC 100% control over Progressive County Mutual is, on paper, as follows: Defendant Progressive County Mutual is 100% controlled by Defendant Progressive Casualty through various agreements and 100% owned by TPC. Progressive Casualty in turn is 100% owned and controlled by TPC, thereby giving TPC 100% control over both Progressive Casualty and Progressive County Mutual.

CLASS ACTION: FIRST AMENDED COMPLAINT

c.  to be responsible for collecting all premiums when due;

d.  to furnish the office space, personnel, supplies, and equipment that will be necessary for the effective and efficient operation of Progressive County Mutual (note: Progressive County Mutual has no employees and relies exclusively on employees of Progressive for its operations); and

e.  to pay all expenses incidental to the operation of Progressive County Mutual.

16.     Progressive conducts its insurance operations in Texas, as in other states, as a single centralized entity, but chooses to adopt the corporate shell of Progressive County Mutual in Texas because, according to Progressive's regulatory disclosures, the county mutual structure allows it to enjoy important exemptions from many Texas insurance laws, including exemptions that allow Progressive considerable rate flexibility compared to most of the other companies that operate in the state. As such, Progressive County Mutual's information with the Texas Department of Insurance ("TDI") identifies TPC's principal address in Ohio as Progressive County Mutual's sole address and Progressive County Mutual's sole contact number as the primary Progressive number 1-800-PROGRESSIVE. Progressive County Mutual provides no Texas address or contact information with the TDI and none could not be found from a search of Progressive County Mutual on the internet. Progressive County Mutual currently identifies no officers or directors with the TDI, but prior TDI records listed one of TPC's corporate counsel as a former Progressive County Mutual officer and that same individual was also identified as an officer of TPC's other shell corporations/affiliates/subsidiaries/alter-egos across the nation, including Progressive Casualty.

17.     Progressive's Texas operation and structure is similar to Progressive's operations elsewhere, such as in California. One of the corporate identities/alter-egos Progressive adopts for its business in California is Pacific Motor Club, which is domiciled and incorporated in California, but again provides the address for TPC's

CLASS ACTION: FIRST AMENDED COMPLAINT

principal office in Ohio as its only address with the California Department of Insurance. The California principal office address listed for Pacific Motor Club with the California Secretary of State is 10929 Disk Dr., Rancho Cordova, CA 95670-- the same address identified on Progressive's www.progressive.com website for "Progressive's Sacramento office." A review of the approximately nineteen (19) Progressive entities registered to do business in California with the California Department of Insurance reveals that almost all of them use TPC's principal office address in Ohio as their address, including Progressive Casualty. In fact, Progressive Casualty, in a filing with the California Department of Insurance, states that its federal income tax return is consolidated with TPC, Pacific Motor Club, and fifty (50) other Progressive entities and that TPC is responsible for Progressive Casualty's deferred compensation, retirement, and postemployment benefit plans. Progressive Casualty's website listed with the California Department of Insurance is www.progressive.com.

18. Pacific Motor Club's filings with the California Secretary of State show that it shares officers and directors with other Progressive entities, including Progressive Casualty, Progressive County Mutual, and TPC. Pacific Motor Club's 2017 disclosure with the California Secretary of State identifies Peter J. Albert as its secretary, Patrick S. Brennan as its chief financial officer, and was submitted by its assistant secretary Christina L. Crews. Progressive Casualty's 2017 disclosure with the California Secretary of State identifies Peter J. Albert as its secretary, Patrick S. Brennan as its chief financial officer, and was submitted by its assistant secretary Christina L. Crews. [3] According to TPC's recent regulatory disclosures, Patrick S. Brennan is also TPC's treasurer. Pacific Motor Club lists Mark Niehaus as an officer, who is also identified as an officer of Progressive Casualty in its regulatory disclosures. Further, Pacific Motor Club identifies Susan Patricia Griffith and John P. Sauerland as its directors. Susan Patricia Griffith is

---

[3] Peter J. Albert was also identified as Progressive County Mutual's secretary in a filing with the Texas Department of Insurance.

CLASS ACTION: FIRST AMENDED COMPLAINT

TPC's president and chief executive officer and John P. Sauerland is TPC's vice president and chief financial officer.

19.   Reflecting this reality, TPC, which is publicly traded and controls Progressive, includes all revenues and financials from its shell corporations/affiliates/subsidiaries nationwide on its required SEC financials disclosures and likewise describes its business as offering insurance, even though its shell corporations/subsidiaries/affiliates are technically identified as the underwriters on the actual insurance policies it provides. For instance, TPC announced in an October 2017 financial disclosure that it wrote $2,221,900,000 in net premiums in September 2017, even though its policies with its insureds identify a specific affiliate/subsidiary/alter-ego as the underwriter depending on the state in which they obtained the insurance, instead of TPC itself.

20.   Similarly, Progressive, on its website, advertisements, and commercials nationwide, refers to TPC and all of its insurance affiliates/subsidiaries simply as Progressive. When an insured signs up for insurance with Progressive by going to its website (www.progressive.com) or calling its number (1-800-PROGRESSIVE), the insured is only informed it is signing up with Progressive and not any specific affiliate/subsidiary because all of the information and communications refer to Progressive and not some other specific affiliate or subsidiary. After an insured signs up with Progressive, she receives communications from Progressive stating that she is now a Progressive insured and detailing all of the benefits and highlights associated with her newly-formed relationship with Progressive. She deals with Progressive when paying premiums, when filing claims, and when any other instance arises necessitating assistance or communication with her insurer. Mr. Williams, for instance, never spoke to, communicated with, heard from, or had any contact with Progressive's Texas shell company/affiliate, Progressive County Mutual. Which makes sense, considering Progressive County Mutual is a shell company existing only on paper.

21.   Similarly, on the www.progressive.com website, it states "Tricia Griffith,

10

president and chief executive officer since July 2016, leads Progressive in our quest to become U.S. consumers' #1 choice for auto insurance." https://www.progressive.com/prorgssice-insurance/company-introduction/.[4] While Tricia Griffith is technically the CEO of TPC, it makes no distinction between TPC and Progressive while describing Ms. Griffith as the leader, president, and chief executive officer of Progressive. Describing the business, it continues "[h]eadquartered in the Cleveland suburb of Mayfield Village, Ohio, Progressive has more than 33,000 employees in almost 400 offices throughout the country." *Id.* Further, it explains "[i]n the early 2000s, Progressive changed its claims focus to provide a better overall experience for every party involved in a claim, including the customer and the body shop. This focus helped us launch our concierge level of claims service — another industry first — in 2003. With this level of service, *Progressive oversees all elements of the claims/repair process on behalf of drivers involved in accidents....*" *See* https://www.progressive.com/progressive-insurance/history/.

22.   Further, even prospective Progressive employees are told they will be working for a single Progressive entity, as seen on Progressive's advertisement for its significant corporate office in California for potential job-seekers. The reader is told of "Progressive's Sacramento office" where "You can't beat the weather — or the work environment." https://www.progressive.com/careers/locations/sacramento/. It describes how they "stay healthy, eat well, and appreciate culture with an on-site fitness center, cafeteria, and artwork from Progressive's expansive corporate art collection. With a little over 400 employees, Progressive people here get to enjoy a small office feel with big corporate advantages." *Id.* Moreover, it explains the "Sacramento office is home to a wide variety of corporate, claims, and contact center jobs, including bilingual opportunities. Specific positions include product managers, analysts, recruiters, human

---

[4] As previously referenced, Patricia Griffith is identified as a director of Progressive's California alter-ego, Pacific Motor Club.

CLASS ACTION: FIRST AMENDED COMPLAINT

resources representative, customer service representatives, sale representatives, claims adjusters, and legal professionals. Learn more about their careers and other Progressive teams." *Id.*[5]

23.   In addition to a main corporate office in Sacramento, Progressive states it has sixteen (16) claims locations in California. Describing working at a Progressive claim center, it states "[w]orking in over 250 locations around the country, these dedicated Progressive people help ensure that our customers are able to get back on the road after the unexpected happens… When you take on a career at one of our claims offices, you truly become the face of Progressive. The talented, reassuring, and service-oriented employees in these roles help handle claims from start to finish, from accident to repair." https://www.progressive.com/careers.locations/claims-offices/.   Progressive's massive, continuous, and systematic California presence makes sense, considering the fact that it wrote $1,310,923,838 in insurance premiums in California in 2016.

24.   As such, it is clear that Progressive, which consists of TPC and all of its different iterations/shells which TPC owns and controls nationwide, including Defendants Progressive County Mutual and Progressive Casualty, is one single enterprise/entity that is at home in California.

25.   Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b)(1) because, for venue purposes, Mitchell and Progressive are residents of this state and judicial district. Moreover, venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

26.   Attached to this Complaint as Exhibit A is a true and correct copy of

---

[5] The address for Progressive's Sacramento corporate office is the same California address listed with the California Secretary of State for Pacific Motor Club, Progressive's wholly owned and controlled entity/alter-ego that is incorporated and domiciled in California.

Progressive's Texas Auto Policy setting forth the terms of Progressive's insuring agreement ("the Policy" or "Texas Policy").

27.    At all relevant times, the Policy included the following relevant clauses:

**INSURING AGREEMENT - COMPREHENSIVE COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1.   **covered auto**, including an attached **trailer**; or
2.   **non-owned auto**;
and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:
1.   contact with an animal (including a bird);
2.   explosion or earthquake;
3.   fire;
4.   malicious mischief or vandalism;
5.   missiles or falling objects;
6.   riot or civil commotion;
7.   theft or larceny;
8.   windstorm, hail, water or flood; or
9.   breakage of glass not caused by **collision**. [6]

**LIMITS OF LIABILITY**

1.   The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:
a.   the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
b.   the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
c.   the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or
d.   the Stated Amount shown on the **declarations page** for that **covered auto**.

. . .

2.   Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:

. . .

f.   The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs. [7]

**PAYMENT OF LOSS**

**We** may, at **our** option:

---

[6] Ex. A at p. 17 (emphasis in original).
[7] Ex. A at pp. 21–22 (emphasis in original).

13

CLASS ACTION: FIRST AMENDED COMPLAINT

1. pay for the loss in money; or
2. repair or replace the damaged or stolen property. [8]

**SETTLEMENT OF CLAIMS**

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

28.  In the Policy, Progressive represents that the actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

29.  The actual cash value offered to Progressive's insureds is not, however, based on the market value, age, and condition of the vehicle at the time the loss occurs.

30.  Instead, Progressive and Mitchell employ a system to calculate actual cash value in a manner which allows them to reduce the calculated value they pay for "total loss vehicles."

31.  Prior to 2010, Progressive determined the actual cash value of total loss vehicles in Texas by using the National Automobile Dealers Association ("NADA") Guidebook.

32.  In 2010, Progressive began using a proprietary product called Work Center Total Loss ("WCTL") licensed from Mitchell to determine the "actual cash values" of total loss vehicles.

33.  The WCTL methodology is different from the methodology used by NADA. WCTL provides total loss valuations automatically based on purported comparable vehicle data contained in its computer system and loss vehicle data provided to it by Progressive inspectors, called Manage Repair Representatives ("MRR"), through a computer interface.

34.  Included among the data provided by Progressive's MRRs to Mitchell's

---

[8] Ex. A at p. 22 (emphasis in original).
[9] Ex. A at pp. 28–29 (emphasis in original).

CLASS ACTION: FIRST AMENDED COMPLAINT

CASE NO. 17-cv-2282

WCTL system are the Vehicle Identification Number (VIN)—which includes the vehicle make, model, configuration (e.g. extras), and year—as well as the mileage and license plate number.

35.     Comparable vehicles referenced by Mitchell's WCTL may be in a wide variety of conditions.

36.     Mitchell's WCTL system has no information as to the condition of the comparable vehicles and does not take such information into consideration in determining the base price.

37.     Progressive's MRRs also assign a numerical value between one (1) and five (5) to reflect the overall vehicle condition as to each of thirteen (13) characteristics listed in the Valuation Report, including Interior, Exterior, Mechanical, and Tire.

38.     WCTL uses weighted averages of the condition values to arrive at an overall condition score between one (1) and five (5).

39.     Although Progressive's records contain descriptions of the vehicles' conditions which Progressive MRRs consider and use in the assignment of the overall condition value, Mitchell's WCTL computer system does not take this information into account, relying only on the numerical condition characteristics when reaching its value determination.

40.     Relying on the loss valuation numerical value only, Mitchell's WCTL system locates vehicles comparable to the loss vehicle by searching a collection of vehicles being offered for sale by a dealer located as close as possible to the loss vehicle's zip code.

41.     A marketing presentation by Mitchell to prospective insurance company clients stated that the average market value as determined by WCTL was $6,780, as compared to an average value of $7,680 under NADA.

42.     Thus, Mitchell's WCTL system assigns actual cash values for total loss vehicles in an amount that is significantly lower than those assigned by published and publicly available valuation models like NADA.

43.     Progressive's own tracking of its total loss claims adjusted by Mitchell under Mitchell's WCTL shows that from May 2012 to April 2014, an average of seventy-eight percent (78%) of total loss vehicles received a downward condition adjustment as compared to only eighteen percent (18%) that received an upward adjustment. The average condition adjustment for that period was $301.

44.     At all relevant times, Defendants engaged in a system of artificially reducing and deflating the value of declared "total loss vehicles" (vehicles where an election is made to forego any vehicle repair) in order to pay first party insureds less than the actual pre-loss value of the total loss vehicle. At the time it entered into the insurance contacts at issue in this case, Progressive was aware, but failed to disclose to plaintiffs, that its WCTL system would yield lower values for total loss vehicles.

45.     For example, Mitchell's WCTL system has no information as to the actual condition of comparable vehicles.

46.     Progressive and Mitchell's valuation and claims adjustment process uses unjustified and unwarranted methods to artificially deflate vehicles' valuations through the use of false, fabricated, and deceptive representations as to comparable vehicles and unwarranted "adjustments" to comparable vehicles in the Mitchell valuation reports with no basis in fact or reality. These include, but are not limited to, the use of unjustified "projected sold adjustments" and adjustments to comparable vehicles based on alleged specifications and upgrades which in fact do not exist.

47.     Progressive knows that its insureds facing total vehicle loss claims are most often also coping with injuries, lost time from work, and loss of their only means of transportation. As a result of these extenuating circumstances, Progressive's insureds are often at a severe disadvantage when it comes to settling claims under their policies.

**PLAINTIFF BLAISE WILLIAMS**

48.     On September 6, 2016, Blaise Williams purchased a 2016 GMC Yukon for $48,050.00, before tax, title, and license.

49.     At all relevant times, Mr. Williams had procured a Progressive Texas Auto

16

Policy that covered the 2016 GMC Yukon and included full comprehensive coverage for his 2016 GMC Yukon.

50.     The terms of Progressive's Texas Auto Policy with Mr. Williams are not individualized, unique, or specific to Mr. Williams. Rather, Mr. Williams' Texas Auto Policy is the same standard form Texas Auto Policy that Progressive uses for all of its Texas insureds with comprehensive coverage. Progressive does not offer its Texas insureds the ability to craft a specific or unique Texas Auto Policy which changes or differs from the standard terms of Progressive's Texas Auto Policies. As such, all of Progressive's insureds who have total losses requiring determination of the actual market value of their total loss vehicles by using Mitchell's services involved Progressive's generic Texas Auto Policies which contained the same terms as those in Mr. Williams Texas Auto Policy.

51.     One of the primary provisions of Progressive's standard Texas Auto Policy is the requirement that Progressive pay its Texas insureds, such as Mr. Williams and the proposed Class, actual market value for their covered total loss vehicles. Mitchell had knowledge of this provision because it specifically marketed to Progressive and contracted with Progressive to perform this exact function required by the standard contractual provision, which was to determine the actual market value for Progressive's Texas insureds' total loss vehicles. Mitchell has been performing the function required by this standard contractual provision for Progressive's Texas insureds total loss vehicles under the same Texas policy provisions since 2010. Based upon information and belief, Mitchell has performed this service for over one-hundred-thousand (100,000) Progressive Texas insureds since 2010. As such, Mitchell had knowledge of the contractual provision requiring Progressive to pay its Texas total loss insureds the actual market value for their total loss vehicles.

52.     Since 2010, Mitchell has been directly involved in adjusting claims made by Progressive's Texas insureds and determining the actual cash values for Progressive's Texas insureds who have submitted claims for total losses and who were, thus, entitled to

17

actual cash value for their vehicles. Mitchell received information from Progressive regarding the Texas insureds' total loss vehicles. Based upon this information, and with knowledge that Progressive was obligated to pay such insureds the actual cash value for such total loss vehicles, Mitchell performed valuation and claim adjustment services to determine the actual cash value for each vehicle based on Mitchell's WCTL, and issued a report which purportedly formed the basis for its determination.

53.    On or about August 26, 2017, Mr. Williams' 2016 GMC Yukon sustained a sudden, direct, and accidental loss resulting from Hurricane Harvey and the associated severe flooding.

54.    Shortly after the hurricane, Mr. Williams filed a claim for the property damages relating to the 2016 GMC Yukon.

55.    Progressive accepted the claim by Blaise Williams.

56.    On or about September 20, 2017, Progressive inspected the 2016 GMC Yukon and notified him the vehicle had been declared a "total loss."

57.    When Mr. Williams asked Progressive how it determined his vehicle to be a "total loss," Progressive stated that it was declaring any vehicle that got any amount of water into it from Hurricane Harvey to be a "total loss."

58.    Approximately four to five days later, Progressive notified Mr. Williams that the vehicle's condition was rated three on a scale from one to three for all aspects of the car.

59.    Progressive told Mr. Williams that, based on Mitchell's valuation system, the actual cash value of the 2016 GMC Yukon at the time of the loss was $38,109.27 and made a full and final offer to settle the claim for $40,341.34, which represented the valuation of $38,109.27, less the deductible of $245, plus taxes and fees.

60.    After Mr. Williams questioned the valuation, a Progressive supervisor contacted Mr. Williams on October 1, 2017 and told him that Mitchell had checked and verified that the valuation of his vehicle was true and correct.

61.    Mr. Williams was also told that such valuations were dispositive as to the

CLASS ACTION: FIRST AMENDED COMPLAINT

amount Progressive was obligated to pay and that Progressive could not change Mitchell's valuations. When discussing the valuation with Progressive's claims adjusters, Progressive relayed Mr. Williams' comments and questions to Mitchell, Mitchell then provided responses to Mr. Williams' comments and questions to Progressive, and Progressive then relayed Mitchell's responses back to Mr. Williams.

62. Using Mitchell's valuation system again, Progressive made a final offer to settle Mr. Williams' claim in the amount of $42,112.17, based on Defendants' valuation of $39,775.92, taxes in the amount of $2,486, fees in the amount of $95.25, minus the deductible of $245.

63. In fact, the actual cash value – based on the market value, age, and condition – of Mr. Williams's vehicle at the time of the flood was $44,025, significantly higher than the amount Progressive paid on Mr. Williams's claim.

64. The Mitchell valuation used by Progressive was fundamentally flawed because it included false adjustments to the comparable vehicles identified in Mitchell's valuation report. Mitchell and Progressive knew or should have known that the cash value assigned to Plaintiff's vehicle did not reflect the actual market value, age, and condition of the vehicle because the specific conditions of the comparable vehicles could be verified through an online search for those vehicles by VIN number.

65. Mitchell's determination of the actual cash value was communicated, unaltered, sent to Progressive's Texas total loss insureds, and represented as the actual cash value of their total loss vehicles which Progressive would pay pursuant to the terms of their respective Texas Auto Policy. Attached as Exhibit B are the Mitchell reports that Mitchell created for Mr. Williams' total loss vehicle supporting its determinations of the actual market value for Mr. Williams' total loss vehicle, and the amount that Mr. Williams was entitled to receive pursuant to the terms of his Texas Auto Policy with Progressive, identified as "Settlement Value" or "Final Value."

66. The "Settlement Value" or "Final Value" amount was determined by subtracting from Mitchell's market value determination the deductible of $245.00

19

specific to Mr. Williams' Texas Auto Policy. Mitchell had knowledge, not only of the standard provisions requiring Progressive to pay Mr. Williams the actual cash value for his vehicle, but also of the specific terms of Mr. Williams' contract with Progressive, as evidenced by Mitchell's knowledge of Mr. Williams' $245.00 deductible and its use of the term "Settlement Value."

67. As previously referenced, Mitchell's valuations do not represent the actual cash value of Mr. Williams' total loss vehicle and, in fact, are based on misrepresentations, falsehoods, and unsupported/unwarranted adjustments. For example, many of the comparable vehicles in Mitchell's reports could not be located after a diligent search and Progressive and Mitchell refused to provide any information on such vehicles demonstrating the source or veracity of such information. These include comparable numbers 1, 2, 3, and 5 on the first valuation report. Comparable numbers 3 and 5 included information about the purported dealership where such information was obtained, but Mr. Williams was unable to locate those vehicles on the purported dealership websites.  Mr. Williams further called these dealerships to inquire about such vehicles and learned that the dealerships had no records of such vehicles.

68. If Progressive and Mitchell had made accurate determinations about the actual cash value of the vehicle, Mr. Williams would have recovered a significantly higher amount from Progressive pursuant to the automobile Policy.

69. Progressive and Mitchell operate on an unequal playing field, compared to its customers and insureds, including Mr. Williams.

70. Progressive contracted to pay Mr. Williams the actual cash value for his total loss vehicle, but in reality, Progressive worked with Mitchell in implementing a system designed to pay him less than the actual cash value.

**CLASS ACTION ALLEGATIONS**

71. Pursuant to FRCP 23(a), (b)(2) and (b)(3), Plaintiff brings this action on his own behalf and on behalf of a proposed Class of all other similarly situated persons in Texas consisting of:

*All insureds under Progressive's Texas Auto Policy whose vehicles were declared total losses by Progressive and were valued utilizing Mitchell's WCTL system ("the Class")*

72.     Excluded from the Class are: (a) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (b) any entity in which any Defendant has a controlling interest, to include, but not limited to, their legal representative, heirs, and successors; (c) all persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (d) any judicial officer in the lawsuit and/or persons within the third degree of consanguinity to such judge.

73.     Upon information and belief, the Class consists of thousands of consumers. Accordingly, it would be impracticable to join all Class Members before the Court.

74.     There are numerous and substantial questions of law or fact common to all of the members of the Class and which predominate over any individual issues. Included within the common question of law or fact to be shown through common evidence are:

a.      Whether Progressive's Texas Policy required it to pay actual cash value to its Texas insureds;

b.      Whether Progressive failed to pay actual cash value to its Texas insureds;

c.      Whether Progressive's contract disclosed all relevant information relating to its calculation of actual cash value of vehicles declared a total loss;

d.      Whether Mitchell's WCTL system's valuation represents the actual cash value of vehicles at the time of the loss;

e.      Whether Progressive's Texas Policy misrepresents a material fact or policy provision;

f.      Whether Progressive's Texas Policy fails to disclose material facts;

g.      Whether Progressive's Texas Policy is misleading with respect to

21

CLASS ACTION: FIRST AMENDED COMPLAINT

material facts;

h.   Whether Progressive and Mitchell had an agreement or understanding on how to calculate the actual cash value of vehicles declared a total loss; and

i.   Whether Progressive and Mitchell had an agreement or understanding to artificially assess the market value, age and condition of a vehicle at the time of loss in order to reduce the actual cash value.

75.   Plaintiff's claims are typical of the claims of Class Members, in that he shares the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiff and Defendants' conduct affecting Class Members, and Plaintiff has no interests adverse to the interests other Class Members.

76.   Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel experienced and competent in the prosecution of complex class actions.

77.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

78.   The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, if any.

79.   Defendants' use of valuation systems to artificially reduce the actual cash value of total loss vehicles will be shown through common evidence.

80.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because (1) there has been no interest shown of members of the class in individually controlling the prosecution of separate actions; (2) Plaintiff is aware of no other litigation concerning the controversy already commenced by any member of the class; (3) it is desirable to concentrate the litigation in this forum; and (4) there are no difficulties likely to be encountered in the management of this class action.

CLASS ACTION: FIRST AMENDED COMPLAINT

# FIRST CAUSE OF ACTION

## BREACH OF CONTRACT – PROGRESSIVE

81.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

82.    Progressive agreed to pay Plaintiff and Class Members for the actual cash value determined by the market value, age, and condition of the vehicle at the time the loss occurred if it was deemed a total loss vehicle by Progressive.

83.    Progressive breached this contract by failing to pay the actual cash value.

84.    As a result, Plaintiff and Class Members were paid for their claims in an amount less than the actual cash value, as contractually required.

WHEREFORE, Plaintiff prays for relief as set forth below.

# SECOND CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH CONTRACT – MITCHELL

85.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

86.    To the extent Mitchell was not acting as an agent of Progressive and was a stranger to the contract between Williams and Progressive, Plaintiff pleads in the alternative that Mitchell willfully and intentionally interfered with the contract by falsely representing the actual cash value of vehicles in its WCTL system such that Plaintiff and Class Members would never be paid based on actual market value, age, and condition of the vehicle.

87.    The Texas Policy was a valid contract between Plaintiff and Class Members and Progressive. Under the Texas Policy, Progressive agreed to pay Plaintiff and Class Members for the actual cash value of their covered autos determined by the market value, age, and condition of the vehicles at the time the loss occurred if they were declared total loss vehicles.

88.    Mitchell knew about this Policy between Plaintiff and Class Members and Progressive because it provided valuation services under its WCTL system.

CLASS ACTION: FIRST AMENDED COMPLAINT

89.   In licensing or otherwise contracting the use of its WCTL system to Progressive, Mitchell had knowledge of the terms of the Policy between Plaintiff and Class Members and Progressive or had knowledge of facts and circumstances that would lead a reasonable person to know about the Texas Auto Policy, including its provisions for actual cash value on total loss vehicles.

90.   As to Plaintiff specifically, Mitchell knew about the make, model, condition and location of the vehicle insurance under the Progressive Policy. See Ex. A.

91.   Mitchell's WCTL system was intentionally designed to disrupt Progressive's obligation under the Policy to pay actual cash value. Mitchell's WCTL system further contributed to or induced Progressive's failure to pay Plaintiff and Class Members the actual cash value for total loss vehicles and hindered the ability of Plaintiff and Class Members to receive the actual value for total loss vehicles.

92.   For purposes of this Second Cause of Action only and consistent with the provisions of Fed. R. Civ. Proc. 8 (a) (3), Plaintiff alleges that Mitchell neither held the authority to bind Progressive nor otherwise was its agent.

93.   Mitchell took an active part in interfering with Progressive's promise to pay the actual cash value with a total loss vehicle, proximately causing harm to Plaintiff and Class Members.

94.   As a proximate result of Mitchell's wrongful conduct, Plaintiff and Class Members were damaged and denied the actual cash value for the total loss vehicles.

WHEREFORE, Plaintiff prays for relief as set forth below.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF TEXAS INSURANCE CODE – PROGRESSIVE

95.   Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

96.   Plaintiff and Class Members are "persons" within the meaning of the Insurance Code § 541.002(2).

97.   Plaintiff and Class Members were injured by Progressive's unfair practices

24

in the business of insurance. Tex. Ins. Code § 541.151.

98. Progressive committed these violations of the Texas Insurance Code knowingly. Tex. Ins. Code § 541.152(b).

99. Progressive incorporated into the Policy the requirements of the Texas Insurance Code, Sections 541.060 and 541.061 relating to unfair and deceptive actions or practice in the business of insurance.

100. Progressive breached Texas Insurance Code Section 541.060(a) by:

    (1)   misrepresenting to Plaintiff and Class Members a material fact or policy provision relating to coverage at issue;

    (2)   failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of:

        (A)   Claims with respect to which the insurer's liability has become reasonably clear.

101. Progressive breached Texas Insurance Code Section 541.061 by:

    (1)   making an untrue statement of material fact;

    (2)   failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made; and

    (3)   making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact.

102. Progressive misrepresented that it would pay actual cash value and failed to state the material fact that the estimates, appraisal, and insurance evaluation systems used by Progressive in the settlement of claims were structured to artificially reduce the model value, age, and condition of the vehicles at the time of the loss.

103. As a proximate result of Progressive's wrongful conduct, Plaintiff and Class Members were damaged and denied the actual cash value for the total loss vehicles.

WHEREFORE, Plaintiff prays for relief as set forth below.

**FOURTH CAUSE OF ACTION**

CLASS ACTION: FIRST AMENDED COMPLAINT

**VIOLATIONS OF TEXAS INSURANCE CODE – MITCHELL**

104.   Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

105.   Plaintiff and Class Members are "persons" within the meaning of Texas Insurance Code § 541.002(2).

106.   Mitchell is a "person" within the meaning of Texas Insurance Code § 541.002(2) because Mitchell is an adjuster as that term is defined in Texas Insurance Code § 541.002(2).

107.   Plaintiff and Class Members were injured by Mitchell's unfair practices in the "business of insurance." Tex. Ins. Code § 541.151. "Not only does the statutory definition list 'adjuster' as one of the class of persons that engages in the "business of insurance," but the Texas Supreme Court has specifically held that the "business of insurance" includes the investigation and adjustment of claims and losses." *Rankin Rd., Inc. v. Underwriters at Lloyds of London*, 744 F. Supp. 2d 630, 633–34 (S.D. Tex. 2010) (citing *Vail v. Texas Farm Bur. Mut. Ins. Co.,* 754 S.W.2d 129, 132 (Tex.1988); *Aetna Casualty & Surety Co. v. Marshall,* 724 S.W.2d 770, 771–72 (Tex.1987)) (internal quotations omitted). This is precisely the task Mitchell was hired to perform, and did perform unfairly, for Progressive in connection with total loss vehicles, including but not limited to Plaintiff's total loss vehicle.

108.   Thus, Mitchell has engaged in the business of insurance, as defined by the Texas Insurance Code, by servicing Progressive's Texas Auto Policies as an investigator and insurance adjuster to adjust the claims and losses in connection with total loss vehicles.

109.   Mitchell breached Texas Insurance Code Section 541.060(a) by:

    (1)    misrepresenting to Plaintiff and Class Members a material fact or policy provision relating to coverage at issue;

    (2)    failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of:

(A)   Claims with respect to which the insurer's liability has become reasonably clear.

110.   Mitchell breached Texas Insurance Code Section 541.061 by:

(1)   making an untrue statement of material fact;

(2)   failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made; and

(3)   making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact.

111.   As more fully explained above, Mitchell misrepresented the actual cash value of total loss vehicles and failed to state the material fact that its WCTL system was structured to artificially reduce the model value, age, and condition of the vehicles at the time of the loss.

112.   As a proximate result of Mitchell's wrongful conduct, Plaintiff and Class Members were damaged and denied the actual cash value for the total loss vehicles.

WHEREFORE, Plaintiff prays for relief as set forth below.

### FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF GOOD FAITH

### AND FAIR DEALING – PROGRESSIVE

113.   Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

114.   Texas law recognizes a duty of good faith and fair dealing in the insurance context. *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). The duty arises from the special relationship that is created by the contract between the insurer and the insured. *Id.*; *see also Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990) (recognizing that the duty arises "not from the terms of the insurance contract, but from an obligation imposed in law" as a result of the special relationship).

115.   At all times herein mentioned, Progressive knew, or in the exercise of good

27

faith reasonably should have known that Plaintiff and Class Members were legally entitled to recover the actual cash value of their vehicles, and that Progressive was obligated to provide Plaintiff and Class Members with the actual cash value for vehicles declared a total loss.

116.   Once it declared Plaintiff and Class Member's vehicles a total loss, Progressive knew that its liability for the actual cash value was reasonably clear under the terms of the Policy.

117.   Progressive denied and delayed payment when liability was reasonably clear.

118.   As a proximate result of Progressive's wrongful conduct, Plaintiff and Class Members were damaged and denied the actual cash value for the total loss vehicles.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION
## CONSPIRACY – PROGRESSIVE AND MITCHELL

119.   Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

120.   Progressive and Mitchell were members of a combination of two or more persons acting to further the common purpose of a conspiracy to implement a system to artificially reduce the actual cash value of vehicles declared total losses.

121.   The object of the combination was to accomplish the unlawful purpose of paying Plaintiff and Class Members less than the actual cash value for their total loss vehicles that they were lawfully and rightfully owed.

122.   In the alternative, the object of the combination was to accomplish the lawful purpose of estimating and appraising vehicles declared total losses by unlawful means, including use of the fraudulent WCTL system.

123.   Progressive and Mitchell had an agreement or understanding about how to artificially reduce the actual cash value of vehicles declared total losses.

124.   Both Progressive and Mitchell, in developing, licensing, and utilizing the

CLASS ACTION: FIRST AMENDED COMPLAINT

CASE NO. 17-cv-2282

WCTL system, committed unlawful and overt acts in furtherance of their conspiracy. In addition, Progressive and Mitchell committed the overt act of misrepresenting the actual cash value of the damaged and total loss vehicles.

125. For purposes of this Sixth Cause of Action only and consistent with the provisions of Fed. R. Civ. Proc. 8 (a) (3), Plaintiff alleges that Mitchell neither held the authority to bind Progressive nor otherwise was its agent and was a stranger to the contract between Progressive and Plaintiff.

126. As a proximate result of Progressive's and Mitchell's wrongful conduct, Plaintiff and Class Members were damaged and denied the actual cash value for the total loss vehicles.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

Plaintiff respectfully prays for relief as follows:

1. For an order certifying the proposed class;

2. For an order finding and declaring that Progressive's and Mitchell's acts and practices as challenged herein are unlawful, unfair and fraudulent;

3. For an order preliminarily and permanently enjoining Progressive

    a. from using Mitchell's valuation reports because Mitchell's reports rely on falsified, deceptive or misleading factors and data in the practices challenged herein and do not represent actual cash values; or

    b. from future violations of Texas law and mandating they disclose the use of Mitchell and that its value is lower than actual cash value;

4. For all damages authorized by law, including treble damages under Texas Insurance Code § 541.152(b);

5. For an accounting;

6. For pre-judgment interest to the extent permitted by law;

7. For an award of attorneys' fees, costs and expenses incurred in the investigation, filing and prosecution of this action under any applicable provision of law;

8.      For interest provided by law;

9.      For declaratory relief; and

10.     For such other and further relief as the Court deems proper.

Respectfully Submitted,

s/ Kimberly D. Neilson, Esq.
FRISELLA LAW, APC
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all triable claims asserted in this Complaint.

Dated: February 16, 2018

Respectfully Submitted,

s/ Kimberly D. Neilson, Esq.
FRISELLA LAW, APC
Attorneys for Plaintiff

CLASS ACTION: FIRST AMENDED COMPLAINT

CASE NO. 17-cv-2282

**Table of Exhibits**

Exhibit A……………………………………………………………….……Page  1-40

Exhibit B……………………………………………………....………..………Page 41-62

**9611A TX 0815**



# TEXAS

## AUTO POLICY

**PROGRESSIVE COUNTY MUTUAL INSURANCE COMPANY**

**7301 Metro Center Drive, Austin, Texas 78744**

**100% reinsured by Progressive Casualty Insurance Company**

**MUTUAL COMPANY PARTICIPATING NONASSESSABLE POLICY**

**THESE POLICY PROVISIONS ALONG WITH THE DECLARATIONS PAGE, APPLICATION, AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THIS POLICY.**

Form 9611A TX (08/15)
version 2.0



Exhibit A
Page 1

<u>CONTENTS</u>

**INSURING AGREEMENT** ................................................................. 1

**GENERAL DEFINITIONS** .............................................................. 1

**PART I—LIABILITY TO OTHERS**

    Insuring Agreement ......................................................................3
    Additional Definitions ..................................................................3
    Additional Payments....................................................................3
    Exclusions ....................................................................................4
    Limits of Liability.........................................................................5
    Financial Responsibility Laws ....................................................6
    Other Insurance ..........................................................................6
    Out-of-State Coverage ................................................................6

**PART II(A)—MEDICAL PAYMENTS COVERAGE**

    Insuring Agreement ....................................................................7
    Additional Definitions ..................................................................7
    Exclusions ....................................................................................7
    Limits of Liability.........................................................................9
    Unreasonable or Unnecessary Medical Expenses ....................9
    Assignment of Benefits ............................................................10
    Other Insurance ........................................................................10

**PART II(B)—PERSONAL INJURY PROTECTION COVERAGE**

    Insuring Agreement ..................................................................10
    Additional Definition ................................................................ 11
    Exclusions .................................................................................. 11
    Limits of Liability....................................................................... 11
    Other Insurance ........................................................................12
    Loss Payments..........................................................................12
    Assignment of Benefits ............................................................12

**PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE**

    Insuring Agreement—Uninsured/Underinsured
      Motorist Bodily Injury Coverage ..........................................12
    Insuring Agreement—Uninsured/Underinsured
      Motorist Property Damage Coverage....................................12
    Additional Definitions................................................................13
    Exclusions ..................................................................................14
    Limits of Liability.......................................................................15
    Other Insurance ........................................................................16

**PART IV—DAMAGE TO A VEHICLE**

    Insuring Agreement—Collision Coverage ...............................16
    Insuring Agreement—Comprehensive Coverage ....................17

i

Insuring Agreement—Additional Custom Parts or
   Equipment Coverage .................................................................17
Insuring Agreement—Rental Reimbursement Coverage..........18
Insuring Agreement—Loan/Lease Payoff Coverage ................18
Insuring Agreement—Pet Injury Coverage ..............................19
Additional Definitions...............................................................19
Exclusions ...............................................................................20
Limits of Liability......................................................................21
Payment of Loss.......................................................................22
No Benefit to Bailee .................................................................23
Loss Payable Clause ................................................................23
Other Sources of Recovery ......................................................23
Appraisal ................................................................................23

**PART V—ROADSIDE ASSISTANCE COVERAGE**
Insuring Agreement .................................................................24
Additional Definitions...............................................................24
Exclusions ...............................................................................24
Unauthorized Service Provider.................................................25
Other Insurance .......................................................................25

**PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS**...........................25

**PART VII—GENERAL PROVISIONS**
Policy Period and Territory........................................................26
Mexico Coverage—Limited ......................................................26
Changes...................................................................................27
Duty to Report Changes ..........................................................27
Our Duties in the Event of a Claim...........................................28
Settlement of Claims ...............................................................28
Terms of Policy Conformed to Statutes ...................................29
Transfer of Interest ..................................................................29
Fraud or Misrepresentation .....................................................29
Payment of Premium and Fees ................................................30
Cancellation ............................................................................30
Cancellation Refund .................................................................31
Nonrenewal .............................................................................31
Automatic Termination .............................................................31
Legal Action Against Us............................................................31
Our Rights to Recover Payment................................................32
Joint and Individual Interests...................................................33
Bankruptcy ..............................................................................33
Mutuals—Membership and Voting Notice ................................33
Mutuals—Participation Clause Without Contingent Liability.....33

Exhibit A
Page 4

## TEXAS AUTO POLICY

## INSURING AGREEMENT

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

## GENERAL DEFINITIONS

The following definitions apply throughout the policy. Defined terms are printed in bold-face type and have the same meaning whether in the singular, plural, or any other form.

1.  "**Additional auto**" means an **auto** and any land motor vehicle of the private passenger automobile, pickup body, utility vehicle or van type with a gross vehicle weight rating of 25,000 pounds or less whose primary use is not the delivery or transportation of goods, materials or supplies, unless their transport is related to farming or ranching, of which **you** become the owner of during the policy period that does not permanently replace an **auto** shown on the **declarations page**, if:
    a.  **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
    b.  **you** pay any additional premium due.
    An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.

2.  "**Auto**" means a land motor vehicle:
    a.  of the private passenger, pickup body, or cargo van type;
    b.  designed for operation principally upon public roads;
    c.  with at least four wheels; and
    d.  with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.
    However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

3.  "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.

4.  "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

5.  "**Business day**" means a day other than a Saturday, Sunday, or a holiday recognized by the state of Texas.

6.  "**Covered auto**" means:
    a.  any **auto** or **trailer** shown on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
    b.  any **additional auto**;

Exhibit A
Page 5

    c.   any **replacement auto**; or

    d.   a **trailer** owned by **you**.

7.   "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

8.   "**Occupying**" means in, upon, or getting in, on, out, or off.

9.   "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of private passenger motor vehicles for use by individuals, businesses, or other entities.

10.  "**Relative**" means a person residing in the same household as **you**, and related to **you** by blood, marriage or adoption, and includes a ward, stepchild, or foster child. **Your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.

11.  "**Replacement auto**" means an **auto** that permanently replaces an **auto** shown on the **declarations page**. "**Replacement auto**" also means any land motor vehicle of the private passenger automobile, pickup body, utility vehicle or van type with a gross vehicle weight rating of 25,000 pounds or less whose primary use is not the delivery or transportation of goods, materials or supplies, unless their transport is related to farming or ranching. A **replacement auto** will have the same coverage as the **auto** it replaces. However, if the **auto** being replaced had or did not have coverage under Part IV—Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days.

12.  "**Ride-sharing activity**" means the use of any vehicle to provide transportation of persons or property in connection with a **transportation network company** from the time a driver logs on to, or signs in to, any online-enabled application, software, website or system until the time the driver logs out of, or signs off of, any such online-enabled application, software, website or system, whether or not the driver has accepted any passenger(s) or delivery assignment, including the time the driver is on the way to pick up any passenger(s) or property, or is transporting any passenger(s) or property.

13.  "**Trailer**" means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:

    a.   for commercial purposes;

    b.   as an office, store, or for display purposes; or

    c.   as a passenger conveyance.

14.  "**Transportation network company**" means a corporation, partnership, sole proprietorship, or other entity that uses any online-enabled application, software, website or system to connect drivers with clients or passengers to facilitate and/or provide transportation or delivery services for compensation or a fee.

15.  "**We**," "**us**" and "**our**" mean the underwriting company providing the insurance, as shown on the **declarations page**.

Exhibit A

Page 6

16. "**You**" and "**your**" mean:
   a.   a person shown as a named insured on the **declarations page**; and
   b.   the spouse of a named insured if:
      (i)    residing in the same household at the time of the loss; or
      (ii)   not residing in the same household during a period of separation in con-
             templation of divorce.

## <u>PART I—LIABILITY TO OTHERS</u>

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and
**property damage** for which an **insured person** becomes legally responsible because
of an accident.

Damages include prejudgment interest awarded against an **insured person**.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I.
**Our** duty to settle or defend ends when **our** limit of liability for this coverage has been
exhausted.

### ADDITIONAL DEFINITIONS

When used in this Part I:
1. "**Insured person**" means:
   a.   **you** or a **relative** with respect to an accident arising out of the ownership,
        maintenance or use of an **auto** or a **trailer**;
   b.   any person with respect to an accident arising out of that person's use of a
        **covered auto** with the permission of **you** or a **relative**;
   c.   any person or organization with respect only to vicarious liability for the acts or
        omissions of a person described in a. or b. above; and
   d.   any "Additional Interest" shown on the **declarations page** with respect only to
        its liability for the acts or omissions of a person described in a. or b. above.
2. "**Property damage**" means physical damage to, destruction of, or loss of use of,
   tangible property.

### ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured person**:
1. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. interest accruing after entry of judgment, until **we** have paid, offered to pay, or de-
   posited in court, that portion of the judgment which does not exceed **our** limit of
   liability. This does not apply if **we** have not been given notice of suit or the opportu-
   nity to defend an **insured person**;
3. the premium on any appeal bond or attachment bond required in any lawsuit **we**
   defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of
   liability, and **we** have no duty to apply for or furnish these bonds;

Exhibit A
Page 7

4.  up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and

5.  reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

**<u>EXCLUSIONS</u>—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.**

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured person** for:

1.  **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle or trailer while it is:
    a.  being used to carry persons for compensation or a fee;
    b.  being used to carry property for compensation or a fee. This exclusion does not apply to **you** or a **relative**, unless the primary usage of the **auto** is to carry property for compensation or a fee;
    c.  rented or leased to another. This exclusion does not apply if **you** or a **relative** lends **your covered auto** to another at no charge other than for reimbursement of operating expenses;
    d.  being used for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
    e.  for **ride-sharing activity**.
    This exclusion does not apply to shared-expense car pools;

2.  **bodily injury** to an employee of that **insured person** arising out of or within the course of employment. This exclusion does not apply to domestic employees if benefits are neither paid nor required to be provided under workers' compensation, disability benefits, or similar laws;

3.  **bodily injury** or **property damage** arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you** or a **relative**, or an agent or employee of **you** or a **relative**, when using a **covered auto**;

4.  **bodily injury** or **property damage** resulting from, or sustained during practice or preparation for:
    a.  any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
    b.  any driving activity conducted on a permanent or temporary racetrack or racecourse;

5.  **bodily injury** or **property damage** due to a nuclear reaction or radiation;

6.  **bodily injury** or **property damage** for which insurance:
    a.  is afforded under a nuclear energy liability insurance contract; or
    b.  would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

7.  any obligation for which the United States Government is liable under the Federal Tort Claims Act;

8.  **bodily injury** or **property damage** caused by an intentional act of that **insured**

Exhibit A
Page 8

**person**, or at the direction of that **insured person**, even if the actual injury or damage is different than that which was intended or expected;

9. **property damage** to any property owned by, rented to, being transported by, used by, or in the charge of that **insured person**. This exclusion does not apply to a rented residence or garage;

10. **bodily injury** to **you** or any **relative**, except to the extent of the minimum limits of liability coverage required by the Texas Transportation Code Chapter 601, entitled "Motor Vehicle Safety-Responsibility Act";

11. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by a **relative** or furnished or available for the regular use of a **relative**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

13. **bodily injury** or **property damage** arising out of **your** or a **relative's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

14. punitive or exemplary damages;

15. **bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. This exclusion applies regardless of whether that **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations; or

16. **property damage** due to or as a consequence of a seizure of any vehicle by federal or state law enforcement officers as evidence in a case against **you** under Chapter 481 of the Health and Safety Code, or under the federal Controlled Substances Act, if **you** are convicted in such a case.

**LIMITS OF LIABILITY**

The limit of liability shown on the **declarations page** for liability coverage is the most **we** will pay regardless of the number of:

1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and

3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

The "each person" limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others arising from such **bodily injury**, including, but not limited to, bystander claims, emotional injury or mental anguish resulting from the **bodily injury** of another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

Any payment to a person under this Part I will be reduced by any payment to that person under Part II(A)—Medical Payments Coverage, Part II(B)—Personal Injury Protection Coverage, or Part III—Uninsured/Underinsured Motorist Coverage.

**We** will not pay under this Part I any expenses paid or payable under Part II(A)—Medical Payments Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

## FINANCIAL RESPONSIBILITY LAWS

When **we** certify this policy as proof of financial responsibility, this policy will comply with the law to the extent required.

## OTHER INSURANCE

If there is any other applicable liability insurance or bond, any liability insurance **we** provide will be excess over any other applicable liability insurance or bond. If more than one liability insurance policy or bond applies on an excess basis, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits.

## OUT-OF-STATE COVERAGE

If an accident to which this Part I applies occurs in any state, territory or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory or pos-

Exhibit A
Page 10

session has:

1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the limits of liability under this policy.

## PART II(A)—MEDICAL PAYMENTS COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay the reasonable expenses incurred for necessary **medical services** received within three years from the date of a **motor vehicle** accident because of **bodily injury**:

1. sustained by an **insured person**; and
2. caused by that **motor vehicle** accident.

**We**, or someone on **our** behalf, will determine:

1. whether the expenses for **medical services** are reasonable; and
2. whether the **medical services** are necessary.

### ADDITIONAL DEFINITIONS

When used in this Part II(A):

1. "**Insured person**" means:
   a. **you** or a **relative**:
      (i) while **occupying** an **auto**; or
      (ii) when struck by a **motor vehicle** or a trailer while not **occupying** a self-propelled motorized vehicle; and
   b. any other person while **occupying** a **covered auto** with the permission of **you** or a **relative**.
2. "**Medical services**" means medical, surgical, dental, x-ray, ambulance, hospital, professional nursing, and funeral services, and includes the cost of eyeglasses, hearing aids, pharmaceuticals, orthopedics, and prosthetic devices.
3. "**Motor vehicle**" means a land motor vehicle designed for use principally on public roads.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II(A).

Coverage under this Part II(A) will not apply to **bodily injury**:

1. sustained by any person while **occupying** a **covered auto** while it is being used:
   a. to carry persons or property for compensation or a fee;

Exhibit A
Page 11

    b.   for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or

    c.   for **ride-sharing activity**.

    This exclusion does not apply to shared-expense car pools;

2. arising out of an accident involving a vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, or an agent or employee of **you** or a **relative**, when using a **covered auto**;

3. to any person resulting from, or sustained during practice or preparation for:

    a.   any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or

    b.   any driving activity conducted on a permanent or temporary racetrack or race-course;

4. due to a nuclear reaction or radiation;

5. for which insurance:

    a.   is afforded under a nuclear energy liability insurance contract; or

    b.   would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

6. for which the United States Government is liable under the Federal Tort Claims Act;

7. sustained by any person while **occupying** any vehicle or trailer while located for use as a residence or premises;

8. if workers' compensation benefits are available for the **bodily injury**;

9. sustained by any person while **occupying** or when struck by any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

10. sustained by any person while **occupying** or when struck by any vehicle owned by a **relative** or furnished or available for the regular use of a **relative**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **you**;

11. to **you** or a **relative**, while **occupying** any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

12. to any person while **occupying** a **covered auto** while leased or rented to others, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply if **you** or a **relative** lends **your covered auto** to another at no charge other than for reimbursement of operating expenses;

13. caused directly or indirectly by:

    a.   war (declared or undeclared) or civil war;

    b.   warlike action by any military force of any government, sovereign or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or

    c.   insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

14. caused directly or indirectly by:

    a.   any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or

    b.  any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

15.  to an **insured person** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. This exclusion applies regardless of whether the **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Medical Payments Coverage is the most **we** will pay for each **insured person** injured in any one accident, regardless of the number of:

1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

Any amount payable to an **insured person** under this Part II(A) will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or Part III—Uninsured/Underinsured Motorist Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## UNREASONABLE OR UNNECESSARY MEDICAL EXPENSES

If an **insured person** incurs expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** may refuse to pay for those expenses and contest them.

If the medical service provider sues the **insured person** because **we** refuse to pay expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** will pay any resulting defense costs, and any resulting judgment against the **insured person**, subject to the limit of liability for this coverage. **We** will choose the counsel. **We** will also pay reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

The **insured person** may not sue **us** for expenses for **medical services we** deem to be unreasonable or unnecessary unless the **insured person** paid the entire disputed amount to the medical service provider or the medical service provider has initiated collection activity against the **insured person** for the unreasonable or unnecessary expenses.

Exhibit A
Page 13

**ASSIGNMENT OF BENEFITS**

Payments for medical expenses will be paid directly to a physician or other healthcare provider if **we** receive a written assignment signed by the **insured person** to whom such benefits are payable.

**OTHER INSURANCE**

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured person occupying** a vehicle or trailer, other than a **covered auto**, will be excess over any other **auto** insurance providing payments for **medical services**.

## PART II(B)—PERSONAL INJURY PROTECTION COVERAGE

**INSURING AGREEMENT**

If **you** pay the premium for this coverage, **we** will pay Personal Injury Protection Benefits because of **bodily injury**:
1.   resulting from a motor vehicle accident; and
2.   sustained by an **insured person**.

**Our** payment will only be for losses or expenses incurred within three years of the accident.

Personal Injury Protection Benefits consist of:
1.   Reasonable expenses incurred for necessary medical and funeral services.
2.   Eighty percent (80%) of an **insured person's** loss of income from employment. This benefit applies only if, at the time of the accident, the **insured person**:
     a.   was an income producer; and
     b.   was in an occupational status.
     Benefits due to loss of income from employment do not apply to any loss after the **insured person** dies.
     Loss of income is the difference between:
     a.   income which would have been earned had the **insured person** not been injured; and
     b.   the amount of income actually received from employment during the disability. If the income being earned as of the date of the accident is a salary or fixed remuneration, it shall be used in determining the amount of income which would have been earned. Otherwise, the average monthly income earned during the period (not more than 12 months) preceding the accident shall be used.
3.   Reasonable expenses incurred for obtaining essential services. These services must replace those an **insured person** would normally have performed:
     a.   without pay;
     b.   during the period of disability; and

Exhibit A
Page 14

c.    for the care and maintenance of the family or household.

Essential service benefits apply only if, at the time of the accident, the **insured person**:

a.    was not an income producer; and

b.    was not in an occupational status.

Essential service benefits do not apply to any loss after the **insured person** dies.

## ADDITIONAL DEFINITION

When used in this Part II(B):

1.    "**Insured person**" means:

    a.    **you** or a **relative**;

        (i)    while **occupying**; or

        (ii)   when struck by;

        a motor vehicle designed for use mainly on public roads or a trailer; and

    b.    any other person while **occupying** a **covered auto** with **your** permission.

## <u>EXCLUSIONS</u>—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II(B).

**We** do not provide Personal Injury Protection Coverage for **bodily injury** sustained:

1.    by any person in an accident caused intentionally by, or at the direction of, that person;

2.    by any person while that person is committing a felony;

3.    by any person while that person is attempting to elude arrest by a law enforcement official;

4.    by any person while **occupying**, or when struck by, any motor vehicle, other than **your covered auto**, which is owned by **you**; or

5.    by a **relative** while **occupying**, or when struck by, any motor vehicle, other than **your covered auto**, which is owned by a **relative**.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for this coverage is the maximum limit of liability for each person injured in any one accident. This is the most **we** will pay regardless of the number of:

1.    **insured persons**;

2.    claims made;

3.    vehicles or premiums shown on the **declarations page**; or

4.    vehicles involved in the accident.

Any amount payable to an **insured person** under this Part II(B) will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or Part III—Uninsured/Underinsured Motorist Coverage.

Exhibit A
Page 15

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## OTHER INSURANCE

If there is other applicable Personal Injury Protection insurance, **we** will pay only **our** share. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide with respect to an **auto you** do not own shall be excess over any other collectible Personal Injury Protection insurance.

## LOSS PAYMENTS

Benefits are payable under this Part II(B) as follows:
1.  Not more frequently than once every two weeks; and
2.  Within 30 days after satisfactory proof of claim is received.

## ASSIGNMENT OF BENEFITS

Payments for medical expenses will be paid directly to a physician or other health care provider if **we** receive a written assignment signed by the **insured person** to whom such benefits are payable.

## <u>PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE</u>

## INSURING AGREEMENT—UNINSURED/UNDERINSURED MOTORIST BODILY INJURY COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of **bodily injury**:
1.  sustained by an **insured person**;
2.  caused by an accident; and
3.  arising out of the ownership, maintenance or use of an **uninsured motor vehicle**.

## INSURING AGREEMENT—UNINSURED/UNDERINSURED MOTORIST PROPERTY DAMAGE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** due to **property damage** to a **covered auto**:
1.  caused by an accident; and
2.  arising out of the ownership, maintenance, or use of an **uninsured motor vehicle**.

If **we** and an **insured person** do not agree as to whether a vehicle is actually uninsured or underinsured, the burden of proof as to that issue shall be on **us**.

Any judgment or settlement for damages against an owner or operator of an **uninsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

**ADDITIONAL DEFINITIONS**

When used in this Part III:

1. "**Insured person**" means:
   a. **you** or a **relative**;
   b. any person while operating a **covered auto** with the permission of **you** or a **relative**;
   c. any person **occupying**, but not operating, a **covered auto**; and
   d. any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a., b. or c. above.

2. "**Property damage**" means physical damage to, or destruction or loss of use of:
   a. a **covered auto**;
   b. any property owned by an **insured person** and contained in the **covered auto** at the time of the accident; and
   c. any property owned by **you** or a **relative** while contained in any **auto** not owned by, but being operated by, **you** or a **relative**.

3. "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:
   a. to which no bodily injury liability bond or policy applies at the time of the accident;
   b. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:
      (i) denies coverage; or
      (ii) is or becomes insolvent;
   c. to which a bodily injury liability bond or policy applies at the time of the accident, but its limit of liability for bodily injury is less than the minimum limit of liability for bodily injury specified by the financial responsibility law of the state in which the **covered auto** is principally garaged;
   d. that is a hit-and-run vehicle whose owner or operator cannot be identified and which strikes:
      (i) **you** or a **relative**;
      (ii) a vehicle that **you** or a **relative** are **occupying**; or
      (iii) a **covered auto**;
      provided that the **insured person**, or someone on his or her behalf, reports the accident to the police or civil authority within 24 hours or as soon as practicable after the accident; or
   e. that is an underinsured motor vehicle. An underinsured motor vehicle is one to which a liability bond or policy applies at the time of the accident, but its limit of liability either:
      (i) is not enough to pay the full amount the **insured person** is legally entitled to recover as damages; or
      (ii) has been reduced by payment of claims to an amount which is not enough to pay the full amount the **insured person** is legally entitled to recover as damages.

Exhibit A
Page 17

An "**uninsured motor vehicle**" does not include any vehicle or equipment:

a. owned by **you** or a **relative** or furnished or available for the regular use of **you** or a **relative**;

b. owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;

c. owned by any governmental unit or agency;

d. operated on rails or crawler treads;

e. designed mainly for use off public roads, while not on public roads;

f. while located for use as a residence or premises; or

g. that is a **covered auto**.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.**

Coverage under this Part III will not apply:

1. to **bodily injury** sustained by any person while using or **occupying**:

   a. a **covered auto** while being used

      (i)   to carry persons for compensation or a fee; or

      (ii)  for **ride-sharing activity**.

      This exclusion does not apply to shared-expense car pools;

   b. a **covered auto** being used to carry property for compensation or a fee. This does not apply to **you** or a **relative**, unless the primary usage of the **auto** is to carry property for compensation or a fee;

   c. a **covered auto** that is rented or leased to another. This exclusion does not apply if **you** or a **relative** lends **your covered auto** to another at no charge other than for reimbursement of operating expenses; or

   d. a motor vehicle that is owned by or available for the regular use of **you** or a **relative**. This exclusion does not apply to a **covered auto** that is insured under this Part III;

2. to **bodily injury** sustained by **you** or a **relative** while using any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

3. directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:

   a. workers' compensation law; or

   b. disability benefits law;

4. to any punitive or exemplary damages;

5. to any person for **bodily injury** or **property damage** resulting from an intentional act of that person;

6. to **bodily injury** sustained by any person if that person or the legal representative of that person settles without **our** written consent;

7. to **bodily injury** arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

8. to **property damage**:

   a. sustained while a **covered auto** is being used or driven by a person while

employed or engaged in any **auto business**. However, this exclusion does not apply to **you** or a **relative**, or an agent or employee of **you** or a **relative**, when using a **covered auto**;

b.  resulting from, or sustained during practice or preparation for:

    (i)  any pre-arranged or organized racing, stunting, speed, or demolition contest or activity; or

    (ii)  any driving activity conducted on a permanent or temporary racetrack or racecourse; or

c.  for which insurance:

    (i)  is afforded under a nuclear energy liability insurance contract; or

    (ii)  would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability; or

9.  to the first $250 of **property damage** sustained by an **insured person** as a result of any one accident.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Uninsured/Underinsured Motorist Coverage is the most **we** will pay regardless of the number of:

1.  claims made;
2.  **covered autos**;
3.  **insured persons**;
4.  lawsuits brought;
5.  vehicles involved in the accident; or
6.  premiums paid.

If **your declarations page** shows a split limit:

1.  the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person;
2.  subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3.  the amount shown for "each accident" for **property damage** is **our** maximum limit of liability for all **property damage** resulting from any one accident.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others arising from such **bodily injury**, including, but not limited to, bystander claims, emotional injury or mental anguish resulting from the **bodily injury** of another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this total limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

The damages recoverable under this Part III will be reduced by all sums:

1. paid or payable because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible;
2. paid or payable under Part I—Liability To Others; and
3. paid or payable because of **bodily injury** under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

**We** will not pay under this Part III any expenses paid or payable under Part II(A)—Medical Payments Coverage or Part II(B) Personal Injury Protection Coverage.

The damages recoverable for **property damage** under this Part III will be reduced by all sums paid or payable because of **property damage** by or on behalf of any persons or organizations who may be legally responsible, including, but not limited to, all sums paid under Part I—Liability To Others.

No one will be entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

**OTHER INSURANCE**

If there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to an **auto you** do not own shall be excess over any other valid and collectible insurance.

For any **property damage** to which the coverage under Part IV—Damage To A Vehicle of this policy (or similar coverage from another policy) and this coverage both apply, **you** may choose the coverage from which damages will be paid. **You** may recover under both coverages, but only if:

1. neither one by itself is sufficient to cover the loss;
2. **you** pay the higher deductible amount (but **you** do not have to pay both deductibles); and
3. **you** will not recover more than the actual damages.

<u>**PART IV—DAMAGE TO A VEHICLE**</u>

**INSURING AGREEMENT—COLLISION COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:

1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;

and its **custom parts or equipment**, resulting from **collision**.

Exhibit A
Page 20

In addition, **we** will pay the reasonable cost to replace any child safety seat damaged in an accident to which this coverage applies.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;
and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:
1. contact with an animal (including a bird);
2. explosion or earthquake;
3. fire;
4. malicious mischief or vandalism;
5. missiles or falling objects;
6. riot or civil commotion;
7. theft or larceny;
8. windstorm, hail, water or flood; or
9. breakage of glass not caused by **collision**.

In addition, **we** will pay for:
1. reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2. loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen.
A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

Coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:
1. when the **auto** has been recovered and returned to **you** or its owner;
2. when the **auto** has been recovered and repaired;
3. when the **auto** has been replaced; or
4. 72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss.

**We** must receive written proof of transportation expenses and loss of use damages.

### INSURING AGREEMENT—ADDITIONAL CUSTOM PARTS OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage

applies in addition to any coverage automatically provided for **custom parts or equip-ment** under Comprehensive Coverage or Collision Coverage.

## INSURING AGREEMENT—RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement Coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or accessories are not covered.

This coverage is limited to the each day limit shown on the **declarations page** for a maximum of 30 days.

If Rental Reimbursement Coverage applies, no other coverage under this policy for rental expenses will apply.

Rental charges will be reimbursed beginning:
1.   when the **covered auto** cannot be driven due to a loss; or
2.   if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto repair shop or one of **our** Service Centers for repairs due to the loss;
and ending the earliest of:
1.   when the **covered auto** has been returned to **you**;
2.   when the **covered auto** has been repaired;
3.   when the **covered auto** has been replaced;
4.   72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by **us** to be a total loss; or
5.   when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

## INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **covered auto** for which this cover-age was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any amounts otherwise payable under this Part IV, the difference between:
1.   the actual cash value of the **covered auto** at the time of the total loss; and
2.   any greater amount the owner of the **covered auto** is legally obligated to pay under a written loan or lease agreement to which the **covered auto** is subject at the time of the total loss, reduced by:
     a.   unpaid finance charges or refunds due to the owner for such charges;
     b.   excess mileage charges or charges for wear and tear;

   c.   charges for extended warranties or refunds due to the owner for extended warranties;

   d.   charges for credit insurance or refunds due to the owner for credit insurance;

   e.   past due payments and charges for past due payments; and

   f.   collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

### INSURING AGREEMENT—PET INJURY COVERAGE

If **you** have purchased Collision coverage for at least one **covered auto** under **your** policy, and if **your pet** sustains injury or death while inside a **covered auto** or **non-owned auto** at the time of a loss covered under Collision or Comprehensive coverage, **we** will provide:

1.   up to $1,000 for reasonable and customary veterinary fees incurred by **you** or a **relative** if **your pet** is injured in, or as a direct result of, the covered loss; or

2.   a $1,000 death benefit if **your pet** dies in, or as a direct result of, the covered loss, less any payment **we** made toward veterinary expenses for **your pet**.

In the event of a covered loss due to the theft of a **covered auto** or **non-owned auto**, **we** will provide the death benefit provided **your pet** is inside that auto at the time of the theft and **your pet** is not recovered.

### ADDITIONAL DEFINITIONS

When used in this Part IV:

1.   "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.

2.   "**Custom parts or equipment**" means equipment, devices, accessories, enhancements and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part of the original sale of a new **auto**, that:

   a.   are permanently installed or attached; and

   b.   alter the appearance or performance of the **auto**.

3.   "**Non-owned auto**" means an **auto** that is not owned by or furnished or available for the regular use of **you** or a **relative** while in the custody of or being operated by **you** or a **relative** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.

4.   "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

5.   "**Your pet**" means any dog or cat owned by **you** or a **relative**.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.**

Coverage under this Part IV will not apply for loss:

1. from **property damage** arising out of the ownership, maintenance, or use of an **auto** or **trailer** while it is:
    a. being used to carry persons or property for compensation or a fee. This exclusion does not apply to shared-expense car pools;
    b. being used to carry property for compensation or a fee. This exclusion does not apply to **you** or a **relative** unless the primary usage of the **auto** is to carry property for compensation or a fee;
    c. rented or leased to another, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply if **you** or a **relative** lends **your covered auto** at no charge other than for reimbursement of operating expenses; or
    d. being used for **ride-sharing activity**;
2. to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;
3. to any vehicle resulting from, or sustained during practice or preparation for:
    a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
    b. any driving activity conducted on a permanent or temporary racetrack or race-course;
4. to any vehicle for which insurance:
    a. is afforded under a nuclear energy liability insurance contract; or
    b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
5. to any vehicle caused by an intentional act committed by or at the direction of **you**, a **relative**, or the owner of a **non-owned auto**, even if the actual damage is differ-ent than that which was intended or expected;
6. to any vehicle while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;
7. due to destruction or confiscation by governmental or civil authorities of any vehicle because **you** or any **relative** engaged in illegal activities. This includes loss due to or as a consequence of a seizure of any vehicle by federal or state law enforcement officers as evidence in a case against **you** under Chapter 481 of the Health and Safety Code, or under the federal Controlled Substances Act, if **you** are convicted in such a case;
8. to any vehicle that is due and confined to:
    a. wear and tear;
    b. freezing;
    c. mechanical, electrical or electronic breakdown or failure; or
    d. road damage to tires.
    This exclusion does not apply if the damage results from the theft of a vehicle;
9. to portable equipment, devices, accessories, and any other personal effects that

20

are not permanently installed. This includes, but is not limited to:

    a.   tapes, compact discs, cassettes, DVDs, and other recording or recorded media;

    b.   any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;

    c.   any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and

    d.   CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;

10.  to any vehicle caused directly or indirectly by:

    a.   war (declared or undeclared) or civil war;

    b.   warlike action by any military force of any government, sovereign, or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or

    c.   insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

11.  to any vehicle caused directly or indirectly by:

    a.   any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or

    b.   any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

12.  to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

**LIMITS OF LIABILITY**

1.   The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:

    a.   the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;

    b.   the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;

    c.   the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or

    d.   the Stated Amount shown on the **declarations page** for that **covered auto**.

   However, the most **we** will pay for loss to:

    a.   **custom parts or equipment** is $1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is $1,000 plus the amount of ACPE **you** purchased.

    b.   a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is $500.

2.   Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:

    a.   If coverage applies to a **non-owned auto**, **we** will provide the broadest coverage applicable to any **covered auto** shown on the **declarations page**.

Exhibit A
Page 25

b.   If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.

c.   Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.

d.   In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by **us**:

   (i)   will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**; and

   (ii)  will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:

      (a)   original manufacturer parts or equipment; and

      (b)   nonoriginal manufacturer parts or equipment.

e.   To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

f.   The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

3.   No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.

4.   Duplicate recovery for the same elements of damages is not permitted.

5.   The following additional limits of liability apply to Pet Injury coverage:

a.   The most **we** will pay for all damages in any one loss is a total of $1,000 regardless of the number of dogs or cats involved.

b.   If **your pet** dies in, or as a direct result of, a covered loss, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for **your pet**.

c.   No deductible shall apply to this coverage.

## PAYMENT OF LOSS

**We** may, at **our** option:

1.   pay for the loss in money; or

2.   repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address shown on the **declarations page**, with payment for any damage resulting from the theft. **We** may keep all or part of the property at the agreed or appraised value.

**We** may settle any loss with **you** or the owner or lienholder of the property.

## NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other bailee for hire.

## LOSS PAYABLE CLAUSE

Payment under this Part IV for a loss to a **covered auto** will be made according to **your** interest and the interest of any lienholder shown on the **declarations page** or desig-nated by **you**. However, if the **covered auto** is not a total loss, **we** may make payment to **you** and the repairer of the **auto**.

The lienholder's interest will not be protected:
1. where fraud, misrepresentation, material omission, or intentional damage resulting in a denial of coverage by **us** has been committed by or at the direction of **you** or any person seeking coverage; or
2. where the loss is otherwise not covered under the terms of this policy.
If this policy is cancelled, nonrenewed or voided, the interest of any lienholder under this agreement will also terminate.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:
1. any coverage provided by the owner of the **non-owned auto** or **trailer**;
2. any other applicable physical damage insurance; and
3. any other source of recovery applicable to the loss.

For any loss to which Uninsured/Underinsured Motorist Property Damage Coverage (from this or any other policy) and this coverage both apply, **you** may choose the cov-erage from which damages will be paid. **You** may recover under both coverages, but only if:
1. neither one by itself is sufficient to cover the loss;
2. **you** pay the higher deductible amount (but **you** do not have to pay both deduct-ibles); and
3. **you** will not recover more than the actual damages.

## APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** or **you** may demand an appraisal of the loss. Within 30 days of any demand for an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's

identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

## PART V—ROADSIDE ASSISTANCE COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

### ADDITIONAL DEFINITIONS

When used in this Part V:
1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
   a. mechanical or electrical breakdown;
   b. battery failure;
   c. insufficient supply of fuel, oil, water, or other fluid;
   d. flat tire;
   e. lock-out; or
   f. entrapment in snow, mud, water or sand within 100 feet of a road or highway.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.

Coverage under this Part V will not apply to:
1. more than three **covered emergencies** for any single **covered auto** in a six-month period;
2. the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3. installation of products or material not related to the disablement;
4. labor not related to the disablement;

5. labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;

6. towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;

7. assistance with jacks, levelers, airbags or awnings;

8. labor or repair work performed at a service station, garage, or repair shop;

9. auto storage charges;

10. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;

11. mounting or removing of snow tires or chains;

12. tire repair;

13. disablement that results from an intentional or willful act or action by **you**, a **relative**, or the operator of a **covered disabled auto**;

14. any **covered auto** while being used in connection with **ride-sharing activity**;

15. any **covered auto** while being used in connection with a **personal vehicle sharing program**; or

16. a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:

1. towing of a **covered disabled auto** to the nearest qualified repair facility; and

2. labor on a **covered disabled auto** at the place of disablement;

which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

### PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:

1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;
6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;
8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and
9. authorize **us** to obtain medical and other records reasonably related to the injury or damage asserted.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory, or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** or trailer shown on the declarations page is being transported between their ports. Coverage is also extended to accidents and losses occurring in Mexico, but only to the extent described under the following "Mexico Coverage—Limited" provision.

### MEXICO COVERAGE—LIMITED

Coverage for **your covered auto** under this policy is extended to accidents occurring in Mexico, but only if within 25 miles of the United States border. This limited extension of coverage only applies to infrequent trips into Mexico that do not exceed 10 days at any one time. "Infrequent trips" means less than 10 trips into Mexico during the 30-day period leading up to and including the actual date of loss. Any insurance that **we** may provide under this provision shall be excess over any other valid and collectible insurance.

### WARNING—READ CAREFULLY

Auto accidents in Mexico are subject to the laws of Mexico—NOT the laws of the United States of America. Unlike the United States, the Republic of Mexico considers an auto accident a CRIMINAL OFFENSE as well as a civil matter.

Exhibit A
Page 30

In some cases, the coverage under this section may NOT be recognized by Mexican authorities, and the company may not be allowed to implement this coverage at all in Mexico. You should consider purchasing auto coverage from a licensed Mexican insurance company before driving into Mexico.

The coverage under this section does not apply to trips into Mexico that exceed 25 miles from the boundary of the United States of America.

## CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you** or a **relative** obtaining a driver's license or operator's permit, or changes in:

1. the number, type or use classification of **covered autos**;
2. the persons who regularly operate a **covered auto**;
3. the persons of legal driving age residing in **your** household;
4. the residents in **your** household;
5. an operator's marital status;
6. **your** mailing address and **your** residence address;
7. the principal garaging address of any **covered auto**;
8. coverage, deductibles, or limits of liability; or
9. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:

1. **your** mailing address or **your** residence address;

Exhibit A
Page 31

2. the principal garaging address of any **covered auto**;
3. the residents in **your** household;
4. the persons of legal driving age residing in **your** household;
5. the persons who regularly operate a **covered auto**;
6. an operator's marital status; or
7. the driver's license or operator's permit status of **you** or a **relative**.

## OUR DUTIES IN THE EVENT OF A CLAIM

1. Within 15 days after **we** receive **your** written notice of claim, **we** must:
   a. acknowledge receipt of the claim. If **our** acknowledgement of the claim is not in writing, **we** will keep a record of the date, method, and content of **our** acknowledgement;
   b. begin any investigation of the claim; and
   c. specify the information **you** must provide. **We** may request more information if during the investigation of the claim such additional information is necessary.
2. After **we** receive the information **we** request, **we** must notify **you** in writing whether the claim will be paid or has been denied, or whether more information is needed:
   a. within 15 **business days**; or
   b. within 30 days if **we** have reason to believe the loss resulted from arson.
3. If **we** do not approve payment of **your** claim or **we** require more time for processing **your** claim, **we** must:
   a. give the reason(s) for denying **your** claim; or
   b. give the reason(s) **we** require more time to process **your** claim. **We** must either approve or deny **your** claim within 45 days after **our** requesting more time.
4. In the event of a weather-related catastrophe or major natural disaster, as defined by the Texas Department of Insurance, the claim handling deadlines as stated above are extended for an additional 15 days.
5. Loss payment:
   a. If **we** notify **you** that **we** will pay **your** claim, or part of **your** claim, **we** must pay within five **business days** after **we** notify **you**.
   b. If payment of **your** claim or part of **your** claim requires the performance of an act by **you**, **we** must pay within five **business days** after the date **you** perform the act.
6. Notice of settlement of liability claim:
   a. **We** will notify **you** in writing of any initial offer to compromise or settle a claim against **you** under the liability section of this policy. **We** will give **you** notice within 10 days after the date the offer is made.
   b. **We** will notify **you** in writing of any settlement of a claim against **you** under the liability section of this policy. **We** will give **you** notice within 30 days after the date of the settlement.

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages,

Exhibit A
Page 32

expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred or assigned to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an accident or loss, if **you**:
1.   made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2.   concealed or misrepresented any material fact or circumstance; or
3.   engaged in fraudulent conduct;

at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1.   make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2.   conceal or misrepresent any material fact or circumstance; or
3.   engage in fraudulent conduct;

in connection with a requested change **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an accident or loss.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an accident or loss if **you**, in connection with the policy application, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

Exhibit A
Page 33

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

## PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by the financial institution. If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

## CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

Notice of cancellation will be mailed at least 10 days before the effective date of cancellation.

**We** may cancel this policy for any reason if the notice is mailed within the first 59 days of the initial policy period.

After this policy is in effect for more than 59 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:
1.  nonpayment of premium;
2.  **you** submit a fraudulent claim; or
3.  loss of driving privileges through suspension or revocation of an operator's license issued to **you**, any driver in **your** household, or any regular operator of a **covered auto**, however, **we** will not cancel if **you** complete a Named Driver Exclusion Election for the principal operator whose license has been suspended or revoked.

**We** may not cancel based solely on the fact that **you** are an elected official.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation. **We** charge a fully earned policy fee for each policy period.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis and mailed no later than 15 days after the effective date of cancellation.

## NONRENEWAL

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. Notice will be mailed at least 30 days before the end of the policy period. **We** may not refuse to renew solely because of the age of an insured person. **We** may also not refuse to renew based solely on the fact that **you** are an elected official.

If the policy period is other than one year, **we** will only have the right to refuse to renew at each anniversary of the original effective date.

## AUTOMATIC TERMINATION

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on a **covered auto**, any similar insurance provided by this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

## LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

Exhibit A
Page 35

We may not be sued for contractual benefits under Part II(A)—Medical Payments Coverage, Part II(B)—Personal Injury Protection Coverage, Part III—Uninsured/Underinsured Motorist Coverage, or Part IV—Damage to a Vehicle unless suit is filed within three years of the date of the accident or loss.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

### OUR RIGHTS TO RECOVER PAYMENT

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another, to the extent of **our** payment. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights.

However, **we** may not assert rights of recovery:
1. against any person who was using a **covered auto** with **your** permission for any payment made under Part IV—Damage To A Vehicle; or
2. for any payment made under Part II(B)—Personal Injury Protection Coverage. This provision does not apply, and **we** will have a right of subrogation and a claim against a person causing or contributing to an accident if, on the date of the loss, financial responsibility as required by Chapter 601, Transportation Code, has not been established for a motor vehicle involved in the accident and operated by that person.

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another without **our** written consent, the insured person's right to payment under any affected coverage will no longer exist.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share of collection

expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

## JOINT AND INDIVIDUAL INTERESTS

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

## BANKRUPTCY

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy.

## MUTUALS—MEMBERSHIP AND VOTING NOTICE

The insured is notified that by virtue of this policy, the insured is a member of the Progressive County Mutual Insurance Company and is entitled as is lawfully provided in the charter, constitution, or bylaws to only one vote, regardless of the number of policies owned, either in person or by proxy in any or all meetings of said company. The Annual Meetings are held in its Home Office at Austin, Texas, on the last Saturday in May, in each year, at 10 o'clock AM.

This policy is issued subject to the constitution and bylaws and all amendments thereto of the company, which shall form a part of this policy.

## MUTUALS—PARTICIPATION CLAUSE WITHOUT CONTINGENT LIABILITY

No Contingent Liability: This policy is nonassessable. The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

Exhibit A
Page 37





**9611A TX 0815**



# Vehicle Valuation Report

Prepared For **Progressive Group of Insurance Companies**   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 17-2946538-01 | | COMPREHENSIVE | BLAISE WILLIAMS HOUSTON, TX 77035 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 08/25/2017 | 08/29/2017 | 09/20/2017 | 1007129513 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2016 | GMC | Yukon SLE 4 Door Utility 116" WB 5.3L 8 Cyl Flexible A RWD | TX 77035 | 19,773 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Summit White | HMS3154, Texas | 1GKS1AKC7GR470149 | No |

## Valuation Summary

### Loss Vehicle Adjustments

Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $38,156.94 |
| Condition - | $47.68 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $0.00 |
| Refurbishment + | $0.00 |
| Title History - | $0.00 |
| Market Value = | $38,109.26 |

### Settlement Adjustments

Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $245.00 |
| Settlement Value = | $37,864.26 |

## Settlement Value:
## $37,864.26

**J.D. POWER**

Mitchell **WorkCenter**
Total Loss
© 2017 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2016 GMC Yukon | SLE 4 Door Utility 116" WB | 5.3L 8 Cyl Flexible A RWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Assist steps, Black with chrome strip | Fog lamps |
| Glass, deep-tinted | Headlamps, halogen projector |
| Liftgate, rear manual | Luggage rack side rails, roof-mounted, Black |
| Mirrors, outside heated power-adjustable, body-color, manual-folding includes spotter mirror | Tire carrier, lockable outside spare winch-type mounted under frame at rear |
| Tire, spare P265/70R17 all-season, blackwall | Tires, P265/65R18 all-season, blackwall |
| Wheel, full-size spare 17" (43.2 cm) steel | Wheels, 18" x 8.5" (45.7 cm x 21.6 cm) bright machined aluminum |
| Windshield style, acoustic laminated glass | Wiper, rear |
| Wipers, front rain-sensing, intermittent | |

### Interior

| | |
|---|---|
| Antenna, integral in rear quarter glass | Assist handles, all seats |
| Audio system feature, Bose premium 9-speaker system with subwoofer in center console | Audio system feature, CD player |
| Audio system, 8" Diagonal Color Touch Screen with IntelliLink AM/FM/SiriusXM with USB ports and auxiliary jack, 8" Diagonal Color Touch Screen with USB ports and auxiliary jack. Includes new text message alert sand Siri Eyes Free functionality through voice command, Bluetooth streaming audio for music and most phones, hands-free smartphone integration, Pandora Internet radio and voice-activated technology for radio and phone. Has an articulating screen with hidden storage and includes 5 USB ports and 1 auxiliary jack (Includes 2 USB ports when (AZ3) bench seat is ordered. See "gmtotalconnect.com" for phone compatibility information.) | Cargo net |
| Climate control, tri-zone automatic with individual climate settings for driver, right-front passenger and rear passengers | Console, floor with storage area, cup holders (Not available with (AZ3) 40/20/40 split -bench front seats.) |
| Cruise control, electronic with set and resume speed | Defogger, rear-window electric |
| Display, driver instrument information enhanced, multi-color | Door locks, power programmable with lockout protection |
| Floor covering, color-keyed carpeting | Floor mats, color-keyed carpeted first and second row, removable |
| Lighting, interior with dome light driver- and passenger-side door switch with delayed entry feature, cargo lights, door handle or Remote Keyless Entry-activated illuminated entry and map lights in front and second seat positions | Mirror, inside rearview manual day/night |
| Power outlet, 110-volt, 1.1 Amp, 150 Watt | Radio, HD |
| Remote keyless entry | Remote vehicle start includes extended range Remote Keyless Entry |
| Seats, front bucket with Premium Cloth passenger seat includes power fore/aft, power recline and Power lumbar, 10-way power driver seat includes 6-way power cushion, 2-way power lumbar control and power recline | Seats, second row 60/40 split-folding bench, manual |
| Seats, third row manual 60/40 split-folding bench, fold flat | SiriusXM Satellite Radio is standard on nearly all 2016 GM models. Enjoy a 3-month All Access trial subscription with over 150 channels including commercial-free music, plus sports, news and entertainment. Plus listening on the app and online is included, so you'll hear the best SiriusXM has to offer, anywhere life takes you. Welcome to the world of SiriusXM. (If you decide to continue service after your trial, the subscription plan you choose will automatically renew thereafter and you will be charged according to your chosen payment method at then-current rates. Fees and taxes apply. To cancel you must call us at 1-866-635-2349. See our Customer Agreement for complete terms at www.siriusxm.com. All fees and programming subject to change.) |
| Steering column, Tilt-Wheel, manual | Steering wheel controls, mounted audio and cruise controls and Driver Information Center controls |
| Steering wheel, leather-wrapped | Theft-deterrent system, electrical, unauthorized entry |

Windows, power all express down, front express up

## Mechanical

| | |
|---|---|
| Alternator, 150 amps | Differential, heavy-duty locking rear |
| Exhaust, aluminized stainless-steel muffler and tailpipe | GVWR, 7100 lbs. (3221 kg) (Standard on 2WD models.) |
| Powertrain grade braking | Rear axle, 3.08 ratio |
| Rear wheel drive | Steering, power |
| Suspension package, premium smooth ride | Suspension, front coil-over-shock with stabilizer bar |
| Suspension, rear multi-link with coil springs | Tools, mechanical jack and wheel wrench stored in rear quarter trim |
| Tow/haul mode selector, button located at end of shift lever | Trailering equipment, heavy-duty includes trailering hitch platform, 7-wire harness with independent fused trailering circuits mated to a 7-way sealed connector and 2" trailering receiver |

## Safety

| | |
|---|---|
| Air bags, frontal and side-impact for driver and front passenger driver inboard seat-mounted side-impact and head curtain side-impact for all rows in outboard seating positions (Always use safety belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Brakes, 4-wheel antilock, 4-wheel disc |
| Daytime Running Lamps, with automatic exterior lamp control | LATCH system (Lower Anchors and Top tethers for Children), for child safety seats; lower anchors and top tethers located in all second row seating positions, top tethers located in third row seating positions |
| OnStar Basic plan for 5 years including limited RemoteLink mobile app services, Vehicle Diagnostics and Dealer Maintenance Notification (Basic Plan available for 5 years from the date of vehicle delivery, and is transferable. Does not include Emergency, Security or Navigation services.) | OnStar Guidance plan for 6 months including Automatic Crash Response, Stolen Vehicle Assistance, Roadside Assistance, Turn-by-Turn Navigation, Vehicle Diagnostics and more (trial excludes Hands-Free Calling) (Visit www.onstar.com for vehicle availability, details and system limitations. Services may vary by model and conditions.) |
| OnStar with 4G LTE provides a built-in Wi-Fi hotspot to connect to the internet at 4G LTE speeds, includes 3GB or 3 months OnStar Data Trial (whichever comes first) (Available 4G LTE Wi-Fi requires compatible mobile device, active OnStar subscription and data plan after trial.) | Parking assist front and rear |
| Passenger Sensing System sensor indicator inflatable restraint, front passenger/child presence detector (Always use safety belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Rear vision camera |
| StabiliTrak, stability control system with brake assist, includes Traction Control | Tire pressure monitoring system |

# Loss Vehicle Base Value

Loss vehicle:  2016 GMC Yukon |  SLE 4 Door Utility 116" WB | 5.3L 8 Cyl Flexible A RWD



Exhibit B
Page 3

## Comparable Vehicle Information

Search Radius used for this valuation: **75 miles from loss vehicle zip/postal code.**
Typical Mileage for this vehicle: **19,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2016 GMC YUKON SLE 4D SUV 8 5.3NORMAL FLEXIBLE A 2WD | 18,128 | 77338 | 27 miles | $41,836.00 Sold Price | $39,625.03 |
| 2 | 2016 GMC YUKON SLE 4D SUV 8 5.3NORMAL FLEXIBLE A 2WD | 23,173 | 77521 | 32 miles | $38,879.00 Sold Price | $37,735.99 |
| 3 | 2016 GMC YUKON SLE 4D SUV 8 5.3NORMAL FLEXIBLE A 2WD | 23,582 | 77079 | 11 miles | $37,995.00 List Price | $36,894.71 |
| 4 | 2016 GMC YUKON SLE 4D SUV 8 5.3NORMAL FLEXIBLE A 2WD | 20,352 | 77037 | 18 miles | $42,515.00 List Price | $38,077.70 |
| 5 | 2016 GMC YUKON SLE 4D SUV 8 5.3NORMAL FLEXIBLE A 2WD | 9,051 | 77065 | 20 miles | $41,988.00 List Price | $36,822.05 |
| 6 | 2016 GMC YUKON SLE 4D SUV 8 5.3NORMAL FLEXIBLE A 2WD | 17,000 | 77521 | 32 miles | $44,329.00 List Price | $39,786.14 |

**Base Value:** **$38,156.94**

# Loss Vehicle Adjustments

Loss vehicle: **2016 GMC Yukon | SLE 4 Door Utility 116" WB | 5.3L 8 Cyl Flexible A RWD**

## Condition Adjustments

Condition Adjustment: **-$47.68**       Overall Condition: **2.93-Good**       Typical Vehicle Condition: **3.00**

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 3 Good | Minimal wear. |
| SEATS | 3 Good | Minimal wear. |
| GLASS | 2 Fair | Damage is repairable. |
| HEADLINER | 3 Good | No damage. |
| DOORS/INTERIOR PANELS | 3 Good | Non permanent soils/stains. |
| DASH/CONSOLE | 3 Good | Non permanent marks/soils/stains. |
| **Exterior** | | |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | 3 Good | Isolated small scratch/scrape. |
| BODY | 3 Good | Isolated damage. No dents/creases/ |
| TRIM | 3 Good | Minimal surface scratches/stone chips. |
| **Mechanical** | | |
| TRANSMISSION | 3 Good | Some oil/fluid buildup around covers/gaskets. |
| ENGINE | 3 Good | Belts/hoses firm. Some oil buildup around covers/gaskets |
| **Tire** | 3 Good | 8, 8, 8, 8 |

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.



Comments:

## Title History Adjustment

| Description | Adjustment Amount |
|---|---|
| The title history deduction is an average deduction that represents a variety of title history types such as flood, hail, collision, etc. and is not specific to a particular title type. In addition, the degree of the damage that resulted in a title history is assumed to be typical. | $0.00 |

# Comparable Vehicles

Loss vehicle:  2016 GMC Yukon | SLE 4 Door Utility 116" WB | 5.3L 8 Cyl Flexible A RWD

| **1** | **2016 GMC YUKON SLE 4D SUV 8 5.3 NORMAL FLEXIBLE A2WD** | | | **Sold Price:  $41,836.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 1GKS1AKC6GRXXXXXX | | 07/22/2017 | 77338 | 27 miles |

Source

DEALER SALE - BUILDSHEET - J.D. POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 19,773 | 18,128 | -$300.06 |
| Equipment | | | |
| CONVENIENCE PACKAGE | No | Yes | -$634.07 |
| WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM | No | Yes | -$1,216.05 |
| LPO, WHEEL LOCKS | No | Yes | -$60.79 |
| | | Total Adjustments: | -$2,210.97 |
| | | **Adjusted Price:** | **$39,625.03** |

Comparable Vehicle Package Details:

CONVENIENCE PACKAGE

Comparable Vehicle Option Details:

WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM, LPO, WHEEL LOCKS



| 2 | 2016 GMC YUKON SLE 4D SUV 8 5.3 NORMAL FLEXIBLE A2WD | | Sold Price:  $38,879.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 1GKS1AKC1GRXXXXXX | | 06/07/2017 | 77521 | 32 miles |

Source

DEALER SALE - BUILDSHEET - J.D.
POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 19,773 | 23,173 | $576.34 |
| **Equipment** | | | |
| CONVENIENCE PACKAGE | No | Yes | -$589.25 |
| WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM | No | Yes | -$1,130.10 |
| | | Total Adjustments: | -$1,143.01 |
| | | **Adjusted Price:** | **$37,735.99** |

Comparable Vehicle Package Details:

CONVENIENCE PACKAGE

Comparable Vehicle Option Details:

WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM

---

| 3 | 2016 GMC YUKON SLE 4D SUV 8 5.3 NORMAL FLEXIBLE A2WD | | List Price:  $37,995.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 1GKS1AEC4GR227880 | | 09/18/2017 | 77079 | 11 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM

MAC HAIK CHEVROLET

11711 KATY FREEWAY

HOUSTON TX 77079

281-406-3525

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,703.00 |
| Mileage | 19,773 | 23,582 | $602.71 |
| | | Total Adjustments: | -$1,100.29 |
| | | **Adjusted Price:** | **$36,894.71** |

| **4** | **2016 GMC YUKON SLE 4D SUV 8 5.3 NORMAL FLEXIBLE A2WD** | | | List Price: **$42,515.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 1GKS1AKC7GR150202 | 20322 | 09/16/2017 | 77037 | 18 miles |

Source

DEALER WEB LISTING - BUILDSHEET - AUTOTRADER.COM

FINCHER'S TEXAS BEST AUTO & TRUCK SALES

8245 NORTH FWY

HOUSTON TX 77037

866-779-3680

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$1,905.00 |
| Mileage | 19,773 | 20,352 | $102.52 |
| Equipment | | | |
| CONVENIENCE PACKAGE | No | Yes | -$615.49 |
| HD TRAILERING PACKAGE | No | Yes | -$379.42 |
| ENHANCED DRIVER ALERT PACKAGE | No | Yes | -$459.50 |
| WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM | No | Yes | -$1,180.41 |
| | | Total Adjustments: | -$4,437.30 |
| | | **Adjusted Price:** | **$38,077.70** |

Comparable Vehicle Package Details:

CONVENIENCE PACKAGE

HD TRAILERING PACKAGE

ENHANCED DRIVER ALERT PACKAGE

Comparable Vehicle Option Details:

WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM

| **5** | **2016 GMC YUKON SLE 4D SUV 8 5.3 NORMAL FLEXIBLE A2WD** | | | List Price: **$41,988.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 1GKS1AKC0GR476813 | B019240A | 08/16/2017 | 77065 | 20 miles |

Source

DEALER WEB LISTING - BUILDSHEET - CARS.COM

BECK & MASTEN NORTH

11300 FM 1960 RD W

HOUSTON TX 77065

281-469-5222

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$1,882.00 |
| Mileage | 19,773 | 9,051 | -$1,510.34 |
| Equipment | | | |
| CONVENIENCE PACKAGE | No | Yes | -$607.85 |
| WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM | No | Yes | -$1,165.76 |
| | | Total Adjustments: | -$5,165.95 |
| | | **Adjusted Price:** | **$36,822.05** |

Comparable Vehicle Package Details:

CONVENIENCE PACKAGE

Comparable Vehicle Option Details:

WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM

| 6 | **2016 GMC YUKON SLE 4D SUV 8 5.3 NORMAL FLEXIBLE A2WD** | | | List Price: **$44,329.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 1GKS1AKC4GR172044 | STK172044 | 09/15/2017 | 77521 | 32 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM

BAYTOWN GMC BUICK

4411 EAST FWY

BAYTOWN TX 77521

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,987.00 |
| Mileage | 19,773 | 17,000 | -$511.93 |
| Equipment | | | |
| CONVENIENCE PACKAGE | No | Yes | -$641.74 |
| WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM | No | Yes | -$1,230.75 |
| LPO, CARGO SHADE, (DEALER-INSTALLED) | No | Yes | -$171.44 |
| | | Total Adjustments: | -$4,542.86 |
| | | **Adjusted Price:** | **$39,786.14** |

Comparable Vehicle Package Details:

CONVENIENCE PACKAGE

Comparable Vehicle Option Details:

WHEELS, 20" X 9" (50.8 CM X 22.9 CM) POLISHED ALUMINUM, LPO, CARGO SHADE, (DEALER-INSTALLED)

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2016 GMC Yukon SLE | 4 Door Utility 116" WB 5.3L 8 Cyl Flexible  RWD | $48,165.00 |



# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was built through a joint partnership between J.D. Power and Associates vehicle valuation division Power Information Network (P.I.N.) and Mitchell International, a leading provider of claims processing solutions to private passenger insurers.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles similar to the loss vehicle in the same market area. WorkCenter Total Loss finds these vehicles in AutoTrader.com, Cars.com, Vast.com and directly from dealerships.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

    Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

    Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

    Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

    Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.



Exhibit B
Page 9



# Specialty Comparable Valuation Report

Prepared for: Progressive Group of Insurance Companies
(800) 321-9843

## Summary

### Claim Information

| | | | | |
|---|---|---|---|---|
| Claim Number: | **17-2946538-01** | | Version #: | **2** |
| Policy Number: | | | Coverage Type of Loss: | **COMPREHENSIVE** |
| Owner: | **BLAISE WILLIAMS** | | Loss Date: | **08/25/2017** |
| Address: | ████████████ | | Reported Date: | **08/29/2017** |
| | **HOUSTON, TX 77035** | | Valuation Report Date: | **10/01/2017 09:57:15** |
| Owner Home Phone: | ████████ | | Valuation Report ID: | **1007162622** |

### Vehicle Information

| | | | | |
|---|---|---|---|---|
| Loss Vehicle: | **2016 GMC Yukon SLE 4 Door Utility 116" WB 5.3L 8 Cyl Flexible A RWD** | | Location: | **TX 77035** |
| | | | Exterior Color: | **Summit White** |
| VIN: | **1GKS1AKC7GR470149** | | License Plate: | **HMS3154, Texas** |
| Mileage: | **19,773 miles** | | | |

Exhibit B
Page 10

## Loss Vehicle Detail

Loss vehicle:   **2016 GMC Yukon SLE 4 Door Utility 116" WB 5.3L 8 Cyl Flexible A RWD**

**Standard Equipment**

## Exterior

| | |
|---|---|
| Assist steps, Black with chrome strip | Fog lamps |
| Glass, deep-tinted | Headlamps, halogen projector |
| Liftgate, rear manual | Luggage rack side rails, roof-mounted, Black |
| Mirrors, outside heated power-adjustable, body-color, manual-folding includes spotter mirror | Tire carrier, lockable outside spare winch-type mounted under frame at rear |
| Tire, spare P265/70R17 all-season, blackwall | Tires, P265/65R18 all-season, blackwall |
| Wheel, full-size spare 17" (43.2 cm) steel | Wheels, 18" x 8.5" (45.7 cm x 21.6 cm) bright machined aluminum |
| Windshield style, acoustic laminated glass | Wiper, rear |
| Wipers, front rain-sensing, intermittent | |

## Interior

| | |
|---|---|
| Antenna, integral in rear quarter glass | Assist handles, all seats |
| Audio system feature, Bose premium 9-speaker system with subwoofer in center console | Audio system feature, CD player |
| Audio system, 8" Diagonal Color Touch Screen with IntelliLink AM/FM/SiriusXM with USB ports and auxiliary jack, 8" Diagonal Color Touch Screen with USB ports and auxiliary jack. Includes new text message alert sand Siri Eyes Free functionality through voice command, Bluetooth streaming audio for music and most phones, hands-free smartphone integration, Pandora Internet radio and voice-activated technology for radio and phone. Has an articulating screen with hidden storage and includes 5 USB ports and 1 auxiliary jack (Includes 2 USB ports when (AZ3) bench seat is ordered. See "gmtotalconnect.com" for phone compatibility information.) | Cargo net |
| Climate control, tri-zone automatic with individual climate settings for driver, right-front passenger and rear passengers | Console, floor with storage area, cup holders (Not available with (AZ3) 40/20/40 split-bench front seats.) |
| Cruise control, electronic with set and resume speed | Defogger, rear-window electric |
| Display, driver instrument information enhanced, multi-color | Door locks, power programmable with lockout protection |
| Floor covering, color-keyed carpeting | Floor mats, color-keyed carpeted first and second row, removable |
| Lighting, interior with dome light driver- and passenger-side door switch with delayed entry feature, cargo lights, door handle or Remote Keyless Entry-activated illuminated entry and map lights in front and second seat positions | Mirror, inside rearview manual day/night |
| Power outlet, 110-volt, 1.1 Amp, 150 Watt | Radio, HD |
| Remote keyless entry | Remote vehicle start includes extended range Remote Keyless Entry |
| Seats, front bucket with Premium Cloth passenger seat includes power fore/aft, power recline and Power lumbar, 10-way power driver seat includes 6-way power cushion, 2-way power lumbar control and power recline | Seats, second row 60/40 split-folding bench, manual |
| Seats, third row manual 60/40 split-folding bench, fold flat | SiriusXM Satellite Radio is standard on nearly all 2016 GM models. Enjoy a 3-month All Access trial subscription with over 150 channels including commercial-free music, plus sports, news and entertainment. Plus listening on the app and online is included, so you'll hear the best SiriusXM has to offer, anywhere life takes you. Welcome to the world of SiriusXM. (If you decide to continue service after your trial, the subscription plan you choose will automatically renew thereafter and you will be charged according to your chosen payment method at then-current rates. Fees and taxes apply. To cancel you must call us at 1-866-635-2349. See our Customer Agreement for complete terms at www.siriusxm.com. All fees and programming subject to change.) |
| Steering column, Tilt-Wheel, manual | Steering wheel controls, mounted audio and cruise controls and Driver Information Center controls |
| Steering wheel, leather-wrapped | Theft-deterrent system, electrical, unauthorized entry |
| Windows, power all express down, front express up | |

## Mechanical

| | |
|---|---|
| Alternator, 150 amps | Differential, heavy-duty locking rear |
| Exhaust, aluminized stainless-steel muffler and tailpipe | GVWR, 7100 lbs. (3221 kg) (Standard on 2WD models.) |
| Powertrain grade braking | Rear axle, 3.08 ratio |
| Rear wheel drive | Steering, power |
| Suspension package, premium smooth ride | Suspension, front coil-over-shock with stabilizer bar |
| Suspension, rear multi-link with coil springs | Tools, mechanical jack and wheel wrench stored in rear quarter trim |
| Tow/haul mode selector, button located at end of shift lever | Trailering equipment, heavy-duty includes trailering hitch platform, 7-wire harness with independent fused trailering circuits mated to a 7-way sealed connector and 2" trailering receiver |

## Safety

| | |
|---|---|
| Air bags, frontal and side-impact for driver and front passenger driver inboard seat-mounted side-impact and head curtain side-impact for all rows in outboard seating positions (Always use safety belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Brakes, 4-wheel antilock, 4-wheel disc |
| Daytime Running Lamps, with automatic exterior lamp control | LATCH system (Lower Anchors and Top tethers for Children), for child safety seats; lower anchors and top tethers located in all second row seating positions, top tethers located in third row seating positions |
| OnStar Basic plan for 5 years including limited RemoteLink mobile app services, Vehicle Diagnostics and Dealer Maintenance Notification (Basic Plan available for 5 years from the date of vehicle delivery, and is transferable. Does not include Emergency, Security or Navigation services.) | OnStar Guidance plan for 6 months including Automatic Crash Response, Stolen Vehicle Assistance, Roadside Assistance, Turn-by-Turn Navigation, Vehicle Diagnostics and more (trial excludes Hands-Free Calling) (Visit www.onstar.com for vehicle availability, details and system limitations. Services may vary by model and conditions.) |
| OnStar with 4G LTE provides a built-in Wi-Fi hotspot to connect to the internet at 4G LTE speeds, includes 3GB or 3 months OnStar Data Trial (whichever comes first) (Available 4G LTE Wi-Fi requires compatible mobile device, active OnStar subscription and data plan after trial.) | Parking assist front and rear |
| Passenger Sensing System sensor indicator inflatable restraint, front passenger/child presence detector (Always use safety belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Rear vision camera |
| StabiliTrak, stability control system with brake assist, includes Traction Control | Tire pressure monitoring system |

## Condition Adjustments

| Condition Adjustment: | $0.00 | Overall Condition: | 2.93-Good | Typical Vehicle Condition: | 3.00 |
|---|---|---|---|---|---|

Claim # 17-2946538-01 | Copyright (c) 2011 - Mitchell International. All Rights Reserved. | Page 4

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 3 Good | Minimal wear. |
| SEATS | 3 Good | Minimal wear. |
| HEADLINER | 3 Good | No damage. |
| DOORS/INTERIOR PANELS | 3 Good | Non permanent soils/stains. |
| DASH/CONSOLE | 3 Good | Non permanent marks/soils/stains. |
| GLASS | 2 Fair | Damage is repairable. |
| **Exterior** | | |
| TRIM | 3 Good | Minimal surface scratches/stone chips. |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | 3 Good | Isolated small scratch/scrape. |
| BODY | 3 Good | Isolated damage.  No dents/creases/ |
| **Mechanical** | | |
| ENGINE | 3 Good | Belts/hoses firm.  Some oil buildup around covers/gaskets |
| TRANSMISSION | 3 Good | Some oil/fluid buildup around covers/gaskets. |
| **Tire** | 3 Good | 8, 8, 8, 8 |

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.

**Comments:**

## Prior Damage Adjustments

| Description | Adjustment Amount |
|---|---|
| | |

| | |
|---|---:|
| Base Value: | $38,298.03 |
| Prior Damage Adjustment: | $0.00 |
| Condition (LV 2.93 to Typical 3.00): | -$65.42 |
| **Market Value:** | $38,232.61 |
| Deductible: | -$245.00 |
| **Final Value:** | $37,987.61 |

**Valuation Notes:**

**Market Sample Records:**

**Comparable 1**

| | | | |
|---|---|---|---|
| **Date:** | 10/01/2017 | **Seller:** | Covert Buick GMC Austin |
| **Contact:** | Dealer Listing | **Location:** | 78759 |
| **Stock #:** | B171595A | **Exterior Color:** | |
| **Phone Number:** | (844) 257-7866 | **Mileage:** | 18,644 miles |
| **Condition:** | Typical | **Price:** | $42,980.00 |
| **VIN:** | 1GKS1AKC2GR174469 | | |
| **Vehicle:** | 2016 GMC Yukon SLE 4 Door Utility 5.3L 8 Cyl Gas A 2WD | | |
| **Equipment:** | Standard, LPO-22" (55.9 Cm) 6-Spoke Premium Silver Ultra-Bright Machined Wheels, LPO-Assist Step Kit-Chrome, Sparkling Silver Metallic, Window Tint - SUV | | |

**Adjustments**

| Adjustment Description | Adjustment Amount |
|---|---|
| Mileage | -$212.54 |
| LPO-22" (55.9 Cm) 6-Spoke Premium Silver Ultra-Bright Machined Wheels | -$2,664.00 |
| LPO-Assist Step Kit-Chrome | -$534.00 |
| Sparkling Silver Metallic | -$351.00 |
| Window Tint - SUV | -$230.00 |
| **Adjusted Price:** | **$38,988.46** |

**Comparable 2**

| | | | |
|---|---|---|---|
| **Date:** | 10/01/2017 | **Seller:** | BMW of West Houston |
| **Contact:** | Dealer Listing | **Location:** | 77449 |
| **Stock #:** | BGR437403 | **Exterior Color:** | |
| **Phone Number:** | (855) 257-1723 | **Mileage:** | 18,384 miles |
| **Condition:** | Typical | **Price:** | $41,981.00 |
| **VIN:** | 1GKS1AKC6GR437403 | | |
| **Vehicle:** | 2016 GMC Yukon SLE 4 Door Utility 5.3L 8 Cyl Gas A 2WD | | |
| **Equipment:** | Standard, HD Trailering Package, LPO-Assist Step Kit-Chrome, Sparkling Silver Metallic, Wheels-22" X 9" (50.8 Cm X 22.9) 6-Spoke Chrome, Window Tint - SUV | | |

**Adjustments**

| Adjustment Description | Adjustment Amount |
|---|---|
| Mileage | -$255.40 |
| HD Trailering Package | -$504.00 |
| LPO-Assist Step Kit-Chrome | -$521.00 |
| Sparkling Silver Metallic | -$343.00 |
| Wheels-22" X 9" (50.8 Cm X 22.9) 6-Spoke Chrome | -$2,520.00 |
| Window Tint - SUV | -$230.00 |
| **Adjusted Price:** | **$37,607.60** |

### *DISCLAIMER*

THIS VALUATION HAS BEEN RESEARCHED AND PROVIDED BASED SOLELY ON THE INFORMATION PROVIDED BY THE INSURANCE COMPANY, AND IS TO BE USED FOR ITS INTENDED PURPOSE ONLY.

THE RESEARCH AND CALCULATIONS CONDUCTED CAN CONSIST OF MARKET RESEARCH OF DEALERSHIP INVENTORIES, AUTOMOTIVE APPRAISAL GUIDES AND DIRECTORIES, AND MARKET SURVEYS OF SIMILAR COMPARABLE VEHICLES. INFORMATION RECEIVED BY OR PROVIDED TO MITCHELL IS BELIEVED TO BE RELIABLE BUT NO RESPONSIBILITY IS ASSUMED BY MITCHELL OR ITS AGENTS FOR ERRORS, INACCURACIES OR OMISSIONS OF THAT INFORMATION.

SINCE ADJUSTMENTS ARE MADE TO EACH COMPARABLE TO BRING IT IN LINE WITH THE LOSS VEHICLE, EQUAL
WEIGHTING FACTORS HAVE BEEN USED IN AVERAGING THE FAIR MARKET VALUE.



# Specialty Comparable Valuation Report

Prepared for: Progressive Group of Insurance Companies
(800) 321-9843

## Summary

### Claim Information

| | | | |
|---|---|---|---|
| Claim Number: | **17-2946538-01** | Version #: | **3** |
| Policy Number: | | Coverage Type of Loss: | **COMPREHENSIVE** |
| Owner: | **BLAISE WILLIAMS** | Loss Date: | **08/25/2017** |
| Address: | ▇▇▇▇▇▇▇▇ | Reported Date: | **08/29/2017** |
| | **HOUSTON, TX 77035** | Valuation Report Date: | **10/05/2017 15:17:34** |
| Owner Home Phone: | ▇▇▇▇▇ | Valuation Report ID: | **1007177582** |

### Vehicle Information

| | | | |
|---|---|---|---|
| Loss Vehicle: | **2016 GMC Yukon SLE 4 Door Utility 116" WB 5.3L 8 Cyl Flexible A RWD** | Location: | **TX 77035** |
| | | Exterior Color: | **Summit White** |
| VIN: | **1GKS1AKC7GR470149** | License Plate: | **HMS3154, Texas** |
| Mileage: | **19,773 miles** | | |

Exhibit B
Page 17

## Loss Vehicle Detail

Loss vehicle:   **2016 GMC Yukon SLE 4 Door Utility 116" WB 5.3L 8 Cyl Flexible A RWD**

**Standard Equipment**

## Exterior

| | |
|---|---|
| Assist steps, Black with chrome strip | Fog lamps |
| Glass, deep-tinted | Headlamps, halogen projector |
| Liftgate, rear manual | Luggage rack side rails, roof-mounted, Black |
| Mirrors, outside heated power-adjustable, body-color, manual-folding includes spotter mirror | Tire carrier, lockable outside spare winch-type mounted under frame at rear |
| Tire, spare P265/70R17 all-season, blackwall | Tires, P265/65R18 all-season, blackwall |
| Wheel, full-size spare 17" (43.2 cm) steel | Wheels, 18" x 8.5" (45.7 cm x 21.6 cm) bright machined aluminum |
| Windshield style, acoustic laminated glass | Wiper, rear |
| Wipers, front rain-sensing, intermittent | |

## Interior

| | |
|---|---|
| Antenna, integral in rear quarter glass | Assist handles, all seats |
| Audio system feature, Bose premium 9-speaker system with subwoofer in center console | Audio system feature, CD player |
| Audio system, 8" Diagonal Color Touch Screen with IntelliLink AM/FM/SiriusXM with USB ports and auxiliary jack, 8" Diagonal Color Touch Screen with USB ports and auxiliary jack. Includes new text message alert sand Siri Eyes Free functionality through voice command, Bluetooth streaming audio for music and most phones, hands-free smartphone integration, Pandora Internet radio and voice-activated technology for radio and phone. Has an articulating screen with hidden storage and includes 5 USB ports and 1 auxiliary jack (Includes 2 USB ports when (AZ3) bench seat is ordered. See "gmtotalconnect.com" for phone compatibility information.) | Cargo net |
| Climate control, tri-zone automatic with individual climate settings for driver, right-front passenger and rear passengers | Console, floor with storage area, cup holders (Not available with (AZ3) 40/20/40 split-bench front seats.) |
| Cruise control, electronic with set and resume speed | Defogger, rear-window electric |
| Display, driver instrument information enhanced, multi-color | Door locks, power programmable with lockout protection |
| Floor covering, color-keyed carpeting | Floor mats, color-keyed carpeted first and second row, removable |
| Lighting, interior with dome light driver- and passenger-side door switch with delayed entry feature, cargo lights, door handle or Remote Keyless Entry-activated illuminated entry and map lights in front and second seat positions | Mirror, inside rearview manual day/night |
| Power outlet, 110-volt, 1.1 Amp, 150 Watt | Radio, HD |
| Remote keyless entry | Remote vehicle start includes extended range Remote Keyless Entry |
| Seats, front bucket with Premium Cloth passenger seat includes power fore/aft, power recline and Power lumbar, 10-way power driver seat includes 6-way power cushion, 2-way power lumbar control and power recline | Seats, second row 60/40 split-folding bench, manual |
| Seats, third row manual 60/40 split-folding bench, fold flat | SiriusXM Satellite Radio is standard on nearly all 2016 GM models. Enjoy a 3-month All Access trial subscription with over 150 channels including commercial-free music, plus sports, news and entertainment. Plus listening on the app and online is included, so you'll hear the best SiriusXM has to offer, anywhere life takes you. Welcome to the world of SiriusXM. (If you decide to continue service after your trial, the subscription plan you choose will automatically renew thereafter and you will be charged according to your chosen payment method at then-current rates. Fees and taxes apply. To cancel you must call us at 1-866-635-2349. See our Customer Agreement for complete terms at www.siriusxm.com. All fees and programming subject to change.) |
| Steering column, Tilt-Wheel, manual | Steering wheel controls, mounted audio and cruise controls and Driver Information Center controls |
| Steering wheel, leather-wrapped | Theft-deterrent system, electrical, unauthorized entry |
| Windows, power all express down, front express up | |

Claim # 17-2946538-01 | Copyright (c) 2011 - Mitchell International. All Rights Reserved. | Page 3

Exhibit B
Page 19

### Mechanical

| | |
|---|---|
| Alternator, 150 amps | Differential, heavy-duty locking rear |
| Exhaust, aluminized stainless-steel muffler and tailpipe | GVWR, 7100 lbs. (3221 kg) (Standard on 2WD models.) |
| Powertrain grade braking | Rear axle, 3.08 ratio |
| Rear wheel drive | Steering, power |
| Suspension package, premium smooth ride | Suspension, front coil-over-shock with stabilizer bar |
| Suspension, rear multi-link with coil springs | Tools, mechanical jack and wheel wrench stored in rear quarter trim |
| Tow/haul mode selector, button located at end of shift lever | Trailering equipment, heavy-duty includes trailering hitch platform, 7-wire harness with independent fused trailering circuits mated to a 7-way sealed connector and 2" trailering receiver |

### Safety

| | |
|---|---|
| Air bags, frontal and side-impact for driver and front passenger driver inboard seat-mounted side-impact and head curtain side-impact for all rows in outboard seating positions (Always use safety belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Brakes, 4-wheel antilock, 4-wheel disc |
| Daytime Running Lamps, with automatic exterior lamp control | LATCH system (Lower Anchors and Top tethers for Children), for child safety seats; lower anchors and top tethers located in all second row seating positions, top tethers located in third row seating positions |
| OnStar Basic plan for 5 years including limited RemoteLink mobile app services, Vehicle Diagnostics and Dealer Maintenance Notification (Basic Plan available for 5 years from the date of vehicle delivery, and is transferable. Does not include Emergency, Security or Navigation services.) | OnStar Guidance plan for 6 months including Automatic Crash Response, Stolen Vehicle Assistance, Roadside Assistance, Turn-by-Turn Navigation, Vehicle Diagnostics and more (trial excludes Hands-Free Calling) (Visit www.onstar.com for vehicle availability, details and system limitations. Services may vary by model and conditions.) |
| OnStar with 4G LTE provides a built-in Wi-Fi hotspot to connect to the internet at 4G LTE speeds, includes 3GB or 3 months OnStar Data Trial (whichever comes first) (Available 4G LTE Wi-Fi requires compatible mobile device, active OnStar subscription and data plan after trial.) | Parking assist front and rear |
| Passenger Sensing System sensor indicator inflatable restraint, front passenger/child presence detector (Always use safety belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Rear vision camera |
| StabiliTrak, stability control system with brake assist, includes Traction Control | Tire pressure monitoring system |

### Condition Adjustments

| Condition Adjustment: | $0.00 | Overall Condition: | 2.93-Good | Typical Vehicle Condition: | 3.00 |
|---|---|---|---|---|---|

Claim # 17-2946538-01 | Copyright (c) 2011 - Mitchell International. All Rights Reserved. | Page 4

Exhibit B
Page 20

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | 3 Good | Non permanent soils/stains. |
| DASH/CONSOLE | 3 Good | Non permanent marks/soils/stains. |
| GLASS | 2 Fair | Damage is repairable. |
| SEATS | 3 Good | Minimal wear. |
| CARPET | 3 Good | Minimal wear. |
| HEADLINER | 3 Good | No damage. |
| **Exterior** | | |
| TRIM | 3 Good | Minimal surface scratches/stone chips. |
| BODY | 3 Good | Isolated damage.  No dents/creases/ |
| PAINT | 3 Good | Isolated small scratch/scrape. |
| VINYL/CONVERTIBLE TOP | Typical | |
| **Mechanical** | | |
| ENGINE | 3 Good | Belts/hoses firm.  Some oil buildup around covers/gaskets |
| TRANSMISSION | 3 Good | Some oil/fluid buildup around covers/gaskets. |
| **Tire** | 3 Good | 8, 8, 8, 8 |

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.

**Comments:**

## Prior Damage Adjustments

| Description | Adjustment Amount |
|---|---|

| | |
|---|---:|
| Base Value: | $39,839.69 |
| Prior Damage Adjustment: | $0.00 |
| Condition (LV 2.93 to Typical 3.00): | -$63.77 |
| **Market Value:** | **$39,775.92** |
| Deductible: | -$245.00 |
| **Final Value:** | **$39,530.92** |

### Valuation Notes:

***MRA, see online diary***

### Market Sample Records:

**Comparable 1**

| | |
|---|---|
| **Date:** 10/05/2017 | **Seller:** Texas Direct Auto |
| **Contact:** Dealer Listing | **Location:** 77477 |
| **Stock #:** 10272068 | **Exterior Color:** |
| **Phone Number:** (888) 820-0591 | **Mileage:** 31,490 miles |
| **Condition:** Typical | **Price:** $40,030.00 |
| **VIN:** 1GKS1AKC8GR236179 | |
| **Vehicle:** 2016 GMC Yukon SLE 4 Door Utility 5.3L 8 Cyl Gas A 2WD | |
| **Equipment:** Standard, Wheels 20" X 9" (50.8 Cm X 22.9 Cm) Polished Aluminum, Convenience Package | |

**Adjustments**

| Adjustment Description | Adjustment Amount |
|---|---|
| Mileage | $1,765.59 |
| Wheels 20" X 9" (50.8 Cm X 22.9 Cm) Polished Aluminum | -$1,160.00 |
| Convenience Package | -$605.00 |
| **Adjusted Price:** | **$40,030.59** |

**Comparable 2**

| | |
|---|---|
| **Date:** 10/05/2017 | **Seller:** Reliable Chevrolet TX |
| **Contact:** Dealer Listing | **Location:** 75080 |
| **Stock #:** GR268536 | **Exterior Color:** |
| **Phone Number:** (866) 367-2360 | **Mileage:** 11,666 miles |
| **Condition:** Typical | **Price:** $42,791.00 |
| **VIN:** 1GKS1AKC1GR268536 | |
| **Vehicle:** 2016 GMC Yukon SLE 4 Door Utility 5.3L 8 Cyl Gas A 2WD | |
| **Equipment:** Standard, Wheels 20" X 9" (50.8 Cm X 22.9 Cm) Polished Aluminum, HD Trailering Package | |

**Adjustments**

| Adjustment Description | Adjustment Amount |
|---|---|
| Mileage | -$1,388.22 |
| Wheels 20" X 9" (50.8 Cm X 22.9 Cm) Polished Aluminum | -$1,240.00 |
| HD Trailering Package | -$514.00 |
| **Adjusted Price:** | **$39,648.78** |

### *DISCLAIMER*

THIS VALUATION HAS BEEN RESEARCHED AND PROVIDED BASED SOLELY ON THE INFORMATION PROVIDED BY THE INSURANCE COMPANY, AND IS TO BE USED FOR ITS INTENDED PURPOSE ONLY.

THE RESEARCH AND CALCULATIONS CONDUCTED CAN CONSIST OF MARKET RESEARCH OF DEALERSHIP INVENTORIES, AUTOMOTIVE APPRAISAL GUIDES AND DIRECTORIES, AND MARKET SURVEYS OF SIMILAR COMPARABLE VEHICLES. INFORMATION RECEIVED BY OR PROVIDED TO MITCHELL IS BELIEVED TO BE RELIABLE BUT NO RESPONSIBILITY IS ASSUMED BY MITCHELL OR ITS AGENTS FOR ERRORS, INACCURACIES OR OMISSIONS OF THAT INFORMATION.

SINCE ADJUSTMENTS ARE MADE TO EACH COMPARABLE TO BRING IT IN LINE WITH THE LOSS VEHICLE, EQUAL WEIGHTING FACTORS HAVE BEEN USED IN AVERAGING THE FAIR MARKET VALUE.